UNITED STATES of America, Appellee,

v.

James GOODING, Appellant.

No. 81–5077.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 8, 1982.

Decided Dec. 7, 1982.

Edward L. Weiner, Fairfax, Va., (Kenneth R. Weiner, Weiner, Weiner & Weiner, P.C. Fairfax, Va., on brief), for appellant.

William G. Otis, Sp. Asst. U.S. Atty., Alexandria, Va. (Justin W. Williams, U.S. Atty., Alexandria, Va., Roslyn R. Mauskopf, Third Year Law Student on brief), for appellee.

Before INGRAHAM, Senior Circuit Judge for the Fifth Circuit, sitting by designation, and WIDENER and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

In this airport-drug-courier-stop case, James Gooding appeals his bench trial conviction of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). He challenges the sufficiency of the evidence to establish his intent to distribute and the denial of his motion to suppress evidence that he contends was obtained by an unconstitutional search. We hold that the evidence was sufficient to convict so that reprosecution is not barred; but we vacate the conviction because the challenged evidence should have been excluded as unconstitutionally obtained.

I

The critical facts, as developed on the pre-trial suppression hearing and on trial, and either uncontested or taken in the light most favorable to the government, are as follows.

At about 3:00 p.m. on November 7, 1980, James Gooding, a black man age 35, arrived in Washington National Airport on a flight from New York City. Although most of the passengers were wearing business suits, Gooding was dressed in slacks, sweater and coat. His casual dress attracted the attention of Drug Enforcement Administration Agent McCracken and Metropolitan Police Detective Bradley who, with Metropolitan Police Detective Isaac, were engaged in general surveillance of the airport to detect drug couriers. They continued to observe Gooding for the next half hour. Gooding was carrying a briefcase and flight bag, but picked up no checked baggage.

To Detective Bradley Gooding seemed to be "nervous, suspicious" as he debarked from the plane and looked up and down the corridors of the concourse. He made a telephone call and appeared to get no response. Agent McCracken then pointed Gooding out to Detective Isaac, telling Isaac that Gooding seemed to be "angry, distraught" over someone's not being there. Detective Isaac, however, by his own later testimony, did not consider that Gooding was acting nervously at any time during the surveillance. The three agents followed and observed Gooding as he walked upstairs, made a second telephone call, entered a bar and put down his bags, left after a minute and walked over to a restaurant, ate a meal for about 25 minutes, made a third telephone call, and then left the airport, walking past the limousine stand towards the public transportation.

At that point, Detectives Isaac and Bradley approached Gooding, showed him their police badges, and Isaac identified the two as police officers. They were not in uniform and did not brandish their weapons. McCracken remained 20–30 feet away. Isaac asked if Gooding would talk with them for a moment, and Gooding agreed.

Isaac asked Gooding for some identification, and Gooding produced an Eastern Airlines return trip shuttle ticket. Isaac asked him for some more official identification, and Gooding opened his briefcase and produced a United States passport. The name on the passport matched that on the ticket. Isaac handed the documents to Bradley, who noted them and returned them to Gooding.

Isaac continued the encounter by informing Gooding that the officers were narcotics investigators, and asked Gooding if he had any narcotics with him. Gooding responded that he did not. Isaac then asked Gooding if he could search his briefcase. Gooding agreed, opened his briefcase, and began handing out its contents. Isaac then asked if he could search Gooding's flight bag. Gooding agreed, put the bag on the ground, unzipped its compartments, and began handing out items. Isaac then asked if he could search the flight bag himself. Gooding said yes and stepped back.

After a couple of seconds, Isaac found a plain, white, sealed, legal size envelope, held it up, and asked Gooding what was in it. Gooding gave no response, so Isaac again asked if he could open it. Gooding still gave no response, so at that point, Isaac advised Gooding that he did not have to consent to the opening of the envelope. Gooding then said he did not want the envelope opened and wanted the entire search stopped.

Isaac then undertook to replace the envelope in the flight bag. In doing so, he saw what appeared to be a quarter-ounce of marijuana in a plastic bag. Isaac placed Gooding under arrest, and McCracken, who had now joined the group, advised him of his right to remain silent. The agents kept the envelope and flight bag, took Gooding to the terminal police station, and obtained a warrant to search the envelope. The envelope contained about 25 grams of 41 percent pure cocaine.

Isaac estimated that the entire confrontation from inception until Gooding was arrested lasted about a minute. He described the tone of the conversation as casual and said he tried to be as polite as possible. The officers denied touching Gooding until they arrested him. Isaac further testified that Gooding would have been free to go up until the time they arrested him. Bradley testified that at one point Isaac told Gooding he was free to leave. The record does not reveal when, if ever, Isaac made such a statement (Isaac himself did not testify that he made it), and the district court made no specific finding on this point. The government acknowledged at oral argument that the statement may well have been made after Isaac found the white envelope. It is at least a plausible surmise, looking to the whole record, that Bradley was referring to the point, after the white envelope was found, at which Isaac said Gooding could decline to consent to the search.

Gooding moved pre-trial to suppress the evidence of the cocaine's discovery in his possession, contending that the investigative encounter that preceded the search of his effects constituted a seizure of his person which, under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967), was only justified under the fourth amendment if based upon a "reasonable articulable suspicion" of criminal activity on his part; that no such suspicion then existed, so that the seizure was illegal; and that, in consequence, "all evidence obtained as a result of this illegal stop must be excluded or suppressed." After an evidentiary hearing, the district judge denied the motion in a brief Memorandum Opinion and Order which contained two salient determinations: that "[t]he *Terry* stop, questioning and subsequent arrest of the defendant ... was lawful"; and that "the search of the defendant's bag was with the full consent and cooperation of the defendant."

Gooding waived jury trial and was convicted after a brief bench trial at which the discovery of the cocaine in his possession was the critical evidence. This appeal followed, with Gooding challenging both the denial of his suppression motion and the sufficiency of the evidence to support a finding of intent to distribute. We take these challenges in that order.

## II

The district court's denial of Gooding's suppression motion was based, without detailed findings or elaborated conclusions of law, upon two express legal/factual determinations, both necessary to its decision. First, that the investigative encounter was throughout a lawful *"Terry*-stop" that did not taint the ensuing multi-stage search. Second, that the untainted search was then justified throughout its course by Gooding's voluntary consent. Gooding attacks both of · these. Because we find reversible error in the first, we do not reach the second.[1]

In addressing the first determination— that the encounter was throughout a "lawful" one—we observe preliminarily that in turn it had two elements: first, that an investigative seizure invoking fourth amendment guarantees had occurred before consent to search was initially given; second, that the seizure was a "lawful" one under controlling principles respecting investigative stops not amounting to arrests. The first requires little discussion; the second is the critical issue.

### A

■ The government contends on appeal as it did in the district court that, as an alternative basis for finding the search untainted by the investigative encounter, the encounter never amounted to a fourth amendment "seizure."[2] The district court ruled against the government on this largely factual determination,[3] and we are not disposed to disturb that ruling.

As indicated, the district court did not elaborate the legal basis for this or its other determinations. In opposing the suppression motion in the district court the government cited and relied upon the majority opinion in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1979), for the proposition that "the brief contact . . . did not constitute a Fourth Amendment seizure." It may therefore fairly be assumed that the district court applied the "not free to leave" test announced in that opinion in rejecting this contention.

■ In view of the unelaborated nature of the order we review here, this seems not the occasion to address the general question of whether and just how that test is to be applied in this circuit to resolve disputed factual questions of the occurrence of fourth amendment seizures short of arrest.[4]

---

1. Gooding's attack on the warrant-based search, independently of any taint from the preceding encounter, could not be lightly dismissed. Essentially it is that once Gooding withdrew his consent to further search of his effects, the officers' conduct in replacing the envelope in his bag instead of simply returning it to Gooding was so patently contrived that it could not be used as the basis for a "plain view" discovery of contents in the bag not earlier seen. On this basis, the taint of the marijuana's discovery carried over to invalidate the subsequent arrest and warrant-based search which flowed from it.

2. As appellee, the government is entitled to present this ruling for review as an alternative basis for upholding its favorable judgment. Against Gooding's contention, no cross-appeal was required. The question was properly raised both below and here.

3. That the district court actually decided this point rather than simply assuming it *arguendo* is suggested not only by the language of its order but by the fact that the government specifically raised the issue in its formal response to the suppression motion. *Cf. Reid v. Georgia,*

448 U.S. 438, 443, 100 S.Ct. 2752, 2755, 65 L.Ed.2d 890 (1979) (Powell, J., concurring). On appeal the government treats the question as one actually decided by the district court.

4. As several courts have recently noted in passing, *see United States v. Rodriguez Perez,* 625 F.2d 1021, 1025–26 (1st Cir.1981); *United States v. Robinson,* 625 F.2d 1211, 1215 (5th Cir.1981), the *Mendenhall* "not free to leave" test has not yet commanded a clear majority of the Supreme Court as an authoritative refinement of *Terry's* root "restraint of liberty" principle. The rule has, however, now been adopted in one way or another in a number of the circuits as the operational test for determining whether a fourth amendment seizure short of arrest has occurred. *See United States v. Wylie,* 569 F.2d 62, 67–68 (D.C.Cir.1977); *United States v. West,* 651 F.2d 71, 72–73 (1st Cir. 1981); *United States v. Elmore,* 595 F.2d 1036, 1041–42 (5th Cir.1979); *United States v. Jefferson,* 650 F.2d 854, 856 (6th Cir.1981); *United States v. Black,* 675 F.2d 129, 134 (7th Cir. 1982); *United States v. Patino,* 649 F.2d 724, 726–27 (9th Cir.1981); *United States v. Berry,* 670 F.2d 583, 595 (5th Cir. Unit B 1982) (en

It suffices here to say that, whether the root principle of *Terry v. Ohio,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16 (1967)—that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen"—be applied directly or by some more particularized test derived from it such as the "not free to leave" *Mendenhall* inquiry, the district court's factual determination that here such a seizure had occurred cannot be held by us to be clearly erroneous.

Here the investigative encounter was initiated by two officers with a third nearby who soon joined it. Though not accompanied by force and carried out in a polite way, it was then prolonged through a preliminary request for identification which yielded nothing suspicious, through a direct inquiry of criminal culpability, into a request for permission to search after culpability had been denied. While from all the surrounding circumstances different factual inferences might clearly have been drawn as to whether by the time he initially consented to search this citizen's liberty was effectively "restrained" by these officers' "show of authority," the district court's implicit finding that it had been is amply supported by the evidentiary record. *Compare, e.g., United States v. Patino,* 649 F.2d at 726–29 (seizure) and *United States v. Jefferson,* 650 F.2d at 856 (same), *with United States v. Black,* 675 F.2d at 136 (no seizure).

We turn therefore to the district court's critical determination, essentially one of law, that on the facts as testified to by the police officers, the seizure was a "lawful" one.

### B

■ The controlling principle here is that an investigative stop, amounting to a

fourth amendment seizure, must be "supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity," *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam) (citations omitted), which means that the suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch,'" *Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. at 1883. In enforcing this principle, the courts must apply objective standards in determining whether at the time of the seizure the requisite degree of suspicion existed. *See Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). In doing this they should of course take into account that trained law enforcement officers may be "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer. *Brown v. Texas,* [443 U.S. at 52 n. 2, 99 S.Ct. at 2641 n. 2]." *United States v. Mendenhall,* 446 U.S. at 563, 100 S.Ct. at 1882 (1980) (Powell, J., concurring). Still, any such special meaning must be articulated to the courts and its reasonableness as a basis for seizure assessed independently of the police officers' subjective assertions, if the courts rather than the police are to be the ultimate enforcers of the principle. *Brown v. Texas,* 443 U.S. at 52, 99 S.Ct. at 2641.

■ Here we are satisfied that on the evidence laid before the district court—taking it in the light most favorable to the government to avoid any review of implicit fact findings—the standard was not met, and the district court erred as a matter of law in its contrary determination.

The law enforcement officers in their testimony and the government in its argument on appeal rely upon six factors as demonstrating a reasonable and articulable suspi-

---

banc); *but cf. United States v. Buenaventura-Ariza,* 615 F.2d 29, 31 n. 3 (2d Cir.1980) (apparently applying more mechanistic test: "when agents approach this individual, identify themselves, and ask the suspect to produce ID or explain his actions").

We have not yet directly addressed the question of the test's use in this circuit. In two

recent airport stop cases, we have specifically reserved the question whether initial questioning constitutes a seizure, holding that any seizure made in the particular cases was justified by a reasonable and articulable suspicion. *See United States v. Harrison,* 667 F.2d 1158 (4th Cir.1982); *United States v. Corbin,* 662 F.2d 1066 (4th Cir.1981).

cion for the officers' pre-consent stop and questioning of Gooding: 1) Gooding arrived from New York, a source city for drugs; 2) he was dressed casually on a 3:00 p.m. businessmen's flight; 3) he made a telephone call immediately after arriving and subsequently made two other phone calls; 4) he scanned the concourse after deplaning; 5) he acknowledged the agents' presence in an alleged cat-and-mouse game of mutual surveillance, and 6) to two of the agents his demeanor appeared "distraught" and "nervous."

We begin by observing that though some of these factors appear in many of the general "drug courier profiles"[5] in current use, the government concedes that most profiles contain additional elements not present here.[6] In any event, we have specifically held that a drug courier profile, without more, does not create a reasonable and articulable suspicion. *United States v. Harrison*, 667 F.2d 1158, 1161 (4th Cir.1982); *see Reid v. Georgia*, 448 U.S. at 440–41, 100 S.Ct. at 2753–54.

The overall weakness of these factors in generating a reasonable suspicion of individual wrongdoing—independent of any force derived from their use in demonstrably helpful law enforcement "profiles"—is obvious upon reflection. The first four, separately or in combination would include such a number of presumably innocent persons as to approach a subjectively administered, random basis for stopping and interrogating passengers coming into Washington National Airport. Seizures on any such random basis are of course one of the precise evils at which the fourth amendment was aimed. *Delaware v. Prouse*, 440

U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *cf. United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). For this reason, we have held that such general characteristics cannot alone be relied upon to support a reasonable suspicion of individualized criminal activity. *United States v. Corbin*, 662 F.2d 1066, 1069 (4th Cir.1981).

In an attempt to bolster the objective criteria here relied upon, the government suggested at oral argument, citing our decision in *Corbin*, that Gooding engaged the police in a "cat and mouse" pattern of mutual surveillance. In *Corbin*, the agents described in detail how the defendants continually scanned the boarding gate and baggage claim area to determine whether they were under surveillance, and even approached an agent ostensibly asking for change. Nothing remotely approaching this suspicious pattern of activity occurred here. After combing the record, all we can find even remotely suggestive of such a pattern is that Gooding scanned the concourse as he debarked the plane, and that the agents, in the course of following him over some thirty minutes, crossed paths with him on three occasions. This is simply not suspicious activity of the kind present in *Corbin*.

The final element relied upon is the agents' perception and description of Gooding's demeanor. Detective Bradley thought that Gooding looked "nervous, suspicious" as he got off the plane and Agent McCracken described Gooding as "distraught" when he received no answer to his first telephone call. The agents testified to nothing suspicious in his demeanor after these initial

---

**5.** The exact elements in the profile, as described by reported cases, vary among cities and agents. *See generally* Comment, *Mendenhall and Reid: The Drug Courier Profile and Investigative Stops*, 42 U.Pitt.L.Rev. 835 (1981).

**6.** Elements of drug courier profiles not present here include a suspect's using small denomination currency for ticket purchases, *see United States v. McClain*, 452 F.Supp. 195, 199 (E.D. Mich.1976); carrying unusually large amounts of currency, *see United States v. Elmore*, 595 F.2d at 1039 n. 3; short turn-around time on flights, *see United States v. Allen*, 644 F.2d 749,

750 (9th Cir.1980); luggage lacking identification tags, *see United States v. Price*, 599 F.2d 494, 500 (2d Cir.1979); continuing flight on another airline, *see United States v. Mendenhall*, 446 U.S. at 547 n. 1, 100 S.Ct. at 1873 n. 1, (1980); deplaning last, *see Id.;* concealing fact traveling with someone, *see Reid v. Georgia*, 448 U.S. at 441, 100 S.Ct. at 2754; or someone waiting for traveler, *see United States v. Elmore*, 595 F.2d at 1039 n. 3; arriving in the early morning hours, *see Reid v. Georgia*, 448 U.S. at 441, 100 S.Ct. at 2754.

moments, and we find it significant that detective Isaac specifically testified that he never saw Gooding acting or looking about in a nervous fashion. In *Corbin*, we attached little weight to the fact that the suspects appeared nervous when they arrived in the airport. 662 F.2d at 1068–69. Although in some contexts nervous or anxious demeanor may obviously be relevant, *see, e.g., United States v. Elmore*, 595 F.2d 1036 (5th Cir.1979), the police officers' articulated and conflicting perceptions of Gooding's demeanor here are simply not of that order.

Though the constitutional requirement of a "reasonable articulable suspicion" for police investigative seizures has come justifiably to be a lenient one in the context of this type case, *see United States v. Buenaventura-Ariza*, 615 F.2d at 35, it nevertheless protects a precious right—hard earned and easily lost—to be free of arbitrary police intrusions on individual privacy and free movement. There is a line, dim though it be, and we are satisfied that here it was crossed. *See id.* at 37. On the objective criteria articulated by the police for the detention of this citizen, we conclude that his seizure was impermissible under the fourth amendment.

### C

Because the district court determined that the "*Terry*-stop" was lawful, it did not of course have to consider whether the taint normally resulting from an illegal seizure or arrest upon the ensuing search here may have been removed by Gooding's initial consent. On oral argument of this appeal the government, with commendable candor, conceded that the consent could not have that effect under the undisputed circumstances of this case.

■ Independently of that concession, we hold, as a matter of law on the undisputed facts of record, that Gooding's illegal seizure tainted all that ensued in the investigative encounter, and that his consent to the initial search, even if voluntary, did not vitiate the taint. The connection, in temporal and causal terms, between the illegal

seizure and the consent—all occurring within in the same brief, continuous encounter—was not sufficiently attenuated to remove the former's taint from the ultimate fruits of the search. *Taylor v. Alabama*, —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

### III

Gooding's challenge to the sufficiency of the evidence to convict him would of course bar his reprosecution were it successful. Hence we must consider it notwithstanding his reprosecution may as a practical, though not legal matter, be effectively foreclosed by exclusion of the illegally obtained evidence.

■ The challenge is quickly disposed of. The contention is that the evidence would not support a finding beyond a reasonable doubt that Gooding's possession of the cocaine was with the intent to distribute it. We disagree.

Intent to distribute illicit drugs "may in proper circumstances be inferred from the amount in possession." *United States v. Welebir*, 498 F.2d 346, 350–51 (4th Cir.1974). Taking the evidence here in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the necessary inference is supportable. That evidence was that Gooding possessed 25.65 grams of 41 percent prime cocaine. An agent testified that it had a street value of approximately $6,000, and that it was packaged in a way typical in his experience of the packaging used by narcotics distributors to maintain the drug's texture. This sufficed to allow the inference. *See United States v. Blake*, 484 F.2d 50, 57–58 (8th Cir.1973) (14.3 grams of 17.3 percent pure heroin with street value of $4,200 sufficient to infer intent to distribute).

### IV

Because Gooding's conviction was obtained by the use of illegally seized evidence,

we vacate the judgment and remand for a new trial if the government would reprosecute.

## VACATED AND REMANDED.

WIDENER, Circuit Judge, dissenting:

I think the majority makes far too much of the district court's use of the word *"Terry"* in its brief opinion. *All* the district court said about the matter at hand in its one page written opinion was: "The *Terry* stop, questioning and subsequent arrest of the defendant at the National Airport by the narcotics agents was lawful...." If the court had said the *Mendenhall*[1] stop, then I take it the result in this case would have been the opposite.

I think the use of the word *"Terry"* by the district court was nothing more than inadvertent, and I cannot read into the simple clause I have quoted above a "factual determination that there was such a [*Terry*] seizure." Neither can I read into the record a basis for the assumption by the majority that the district court applied and rejected the "not free to leave" test of *Mendenhall* by the mere fact that the government relied on that case. Indeed, during the suppression hearing, the district court again referred to *"Terry"* just before it said, obviously referring to the defendant, as well as other narcotics couriers, "... all he had to do was say, 'Bye bye,' you know and the officer can't stop him from going out." Can this be other than a factual finding that the defendant was free to leave at any time during the initial questioning?

The facts upon which the plurality opinion of Justice Stewart in *Mendenhall* found that there had been no constitutional intrusion when the defendant was free to leave, and upon which the concurring opinion of Justice Powell held that the officers possessed reasonable and articulable suspicion of criminal activity, were not significantly different from the facts here. In *Mendenhall* the defendant was arriving on a flight

from Los Angeles, a city of origin for heroin (here it was New York); the *Mendenhall* defendant was the last person to leave the plane (here the defendant was dressed in casual clothes on a flight usually filled with passengers wearing business suits); the defendant in *Mendenhall* " 'appeared to be very nervous' " as this defendant was "nervous, suspicious;" the defendant in *Mendenhall* completely scanned the whole area where the agents were standing, while this defendant looked up and down the corridors of the concourse and made a telephone call, getting angry and distraught over someone's not answering; and the *Mendenhall* defendant proceeded past the baggage area without claiming any luggage, while this defendant made two other telephone calls, ate a meal, and then walked past the taxicab and limousine stand, headed toward other public transportation. 446 U.S. 544, n. 1, 100 S.Ct. at 1873, n. 1.

The approach of the officers in each case was the same. It was in public view and not rude or overpowering. Nothing in the officer's approach here, as in *Mendenhall,* even suggested that the defendant was not free to leave at any time. Because the defendant was free to leave, I would affirm the district court on the basis of the plurality opinion in *Mendenhall,* but if that would not suffice, I note that this defendant acted just as suspicious as the defendant in *Mendenhall,* for which activities the concurring opinion in *Mendenhall* found a reasonable and articulable suspicion of criminal activity.

Certainly if the officers in this case had walked up to the defendant and said only "Sir, we are investigating narcotics traffic between New York and Washington and request that you consent to a search of your luggage," a consent which followed would have been valid. I see no reason to distinguish this case because of the preliminary question requiring identification.

I would thus affirm.[2]

---

1. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1979).

2. The recent case of *United States v. Black,* 675 F.2d 129 (7th Cir.1982), sustained a conviction on facts not significantly different from those

86

at hand. *Black* pointed out there are three kinds of fourth amendment intrusion. The first is an arrest which must be justified by probable cause. The second is an investigatory stop which includes a detention of the person. This second type stop requires a reasonable and articulable suspicion that the person stopped has committed or is committing a crime. The third category is that in which there is no restraint of the liberty of the person involved, but his voluntary cooperation is elicited through non-coercive questioning. This third type of stop does not rise to the level of seizure of the person if the person is free to leave under the plurality opinion of Justice Stewart in *Mendenhall.*