829 F.2d 37
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard Nathaniel SMITH, Defendant-Appellant.
 No. 86-5629
 United States Court of Appeals, Fourth Circuit.
 Submitted April 27, 1987.
Decided September 2, 1987.
 
 (Fred Warren Bennett, Federal Public Defender, Stephen J. Cribari, Deputy Federal Public Defender, Terrence J. King, Third Year Law Student, on brief), for appellant.
 Charles R. Brewer, United States Attorney, David Alan Graham, Assistant United States Attorney, on brief), for appellee.
 Before JOMES DICKSON PHILLIPS, SPROUSE and WILKINS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Richard Nathaniel Smith appeals from his conviction of possession of cocaine with the intent to distribute resulting from a consensual search of his suitcase at Douglas International Airport in Charlotte, North Carolina. Smith argues here (1) that he was seized without reasonable and articulable suspicion and (2) that his bag was illegally searched, either (a) incident to an unlawful arrest or (b) without his consent. We affirm the conviction.
 
 
 2
 Smith arrived in Charlotte at about 4:15 p.m. on February 25, 1986, on a flight from Tampa, Florida. As he deplaned he was observed by Agent Jack Davis of the North Carolina Bureau of Investigation to be a casually dressed man arriving from a drug source city, wearing gold jewelry and sunglasses and carrying his ticket and an airline schedule. Smith appeared to notice Agent Davis and glanced toward him several times.
 
 
 3
 Agent Davis approached Smith, identified himself, and asked if Smith would mind speaking with him. Smith agreed, and in the conversation which followed Agent Davis saw Smith's hands shaking noticeably, learned that he would be taking a flight to Atlanta at 7:25 p.m., that he was a registered alien and that he had a baggage claim check. Agent Davis was aware that couriers taking drugs from Florida to Atlanta often use a circuitous route to avoid suspicion. Davis asked Smith why he was going to Atlanta and Smith replied that he was not going to see anyone, but just to see what the place looked like. When Davis told Smith that he was seeking Smith's cooperation in a narcotics investigation and asked Smith if he would allow a search of his person and his bag, Smith first replied that he had no bag. Davis reminded him of the baggage claim check; Smith then said his bag had gone on to Atlanta, but Davis assured Smith that the bag was still in Charlotte and could be located.
 
 
 4
 Smith immediately appeared to buckle at the knees and to be in danger of falling. He asked if he could sit down and Davis told him that he was not under arrest and could do whatever he wanted to do. Smith first leaned against a ledge behind him, broke into a sweat and began to breathe irregularly; then he walked to some chairs nearby, sat down and leaned back with his eyes closed, continuing to breath shallowly and to sweat, though he told Davis he was all right and did not need medical attention.
 
 
 5
 After a few minutes Smith seemed to recover. Davis again told him that he was not under arrest and asked his cooperation and asked for permission to search him and his bag. Smith was unsure he would allow a search of his bag, saying he did not know what was in it. Smith agreed to a pat-down of his person, but requested that it be done in the men's restroom. Davis found nothing of interest except a checkbook for the Architectural Drafting Company in Pinellas Park, Florida. Smith said the checks were for his work. Davis asked again for permission to search Smith's bag and Smith said he did not like the idea. Davis then told Smith that although he was free to go, Davis would retain Smith's bag for a sniff test.
 
 
 6
 Shortly after this, while Davis was on the phone arranging for use of a narcotics detection dog, he saw Smith and motioned him over to ask where he wanted his bag sent when the dog had examined it. Smith said he did not know where he would be staying in Atlanta. Smith could not find his ticket and thought Davis still had it. Davis had returned the ticket to Smith earlier; they both spent a few minutes looking in the area where Smith had felt ill.
 
 
 7
 David asked two uniformed airport police officers to keep a loose surveillance on Smith while he remained in the airport and to inform him if Smith left the airport, and by what means, so that he would know where to begin a search if necessary. In the past, a number of drug courier suspects had left the airport while Davis was trying to get a search warrant. During the course of the surveillance, Smith became aware that the two officers were keeping tabs on him.
 
 
 8
 Davis learned from the airline that Smith's original reservation had been for two people named Smith and that they had given the same telephone number as one which was on an old tag still attached to Smith's bag. He learned from the telephone company that the number listed as Smith's home telephone was the same number which was on the checks from Architectural Drafting Company and that both had been disconnected. At this point Davis located Smith; he asked if Smith was travelling alone and who had made his reservations; he also informed Smith that he had learned that both Smith's home and work telephones had been disconnected. Smith answered that he was travelling alone and that he did not know who had made his reservations. Smith was vague about whose telephone number was on the old baggage tag. He told Davis that he had found his misplaced ticket--in a trash can--and that Davis should send his bag to Piedmont baggage in Atlanta where he would pick it up.
 
 
 9
 The narcotics dog did not alert to Smith's bag, but Smith's conduct had been unusual enough to arouse suspicion that it might contain explosives or other contraband. Davis and Sgt. Harkey of the Charlotte Police Department therefore approached Smith in the concourse, identified Harkey and asked if Smith would be willing to talk with him. Smith agreed and Harkey then asked twice whether he had any guns, explosives, contraband or controlled substances in the bag. Each time Smith answered that he did not know what was in the bag. Harkey asked if Smith would consent to a search of his bag and Smith replied, 'Do what you need to do. I don't know what's in my bag.' About one pound of cocaine was found in the bag. Davis advised Smith of his Miranda rights and after it was read to him and he read it himself, Smith signed an acknowledgment form saying he had consented to the search of his bag.
 
 
 10
 After a suppression hearing, the district court determined that Smith's encounter with the several law enforcement agents at Charlotte airport was entirely consensul and that no seizure occurred, and denied the motion to suppress.
 
 
 11
 A district court's determination that a seizure has or has not occurred is essentially factual and will be upheld unless it is clearly erroneous. United States v. Gooding, 695 F.2d 78, 82 (4th Cir. 1982). In United States v. Mendenhall, 446 U.S. 544, 553-54 (1980), the Supreme Court decided that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. In the absence of such force or a show of authority which would cause a reasonable person to believe that his freedom of movement had been curtailed, no seizure occurs. Therefore, law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, or by putting questions to him. Florida v. Royer, 460 U.S. 491, 497 (1983). Nor would the fact that the officer identifies himself as a police officer, without more, constitute such a display of authority as to convert the encounter into a seizure requiring some level of objective justification. Id. A person approached in this way may legally disregard the questions put to him and walk away. Mendenhall, 446 U.S. at 554.
 
 
 12
 In this case, the agent and the police officers did nothing, until they discovered the cocaine, which would have caused a reasonable person to believe he was not free to leave the airport. The law enforcement agents did not engage in any of the conduct which the Supreme Court in Mendenhall identified as likely to give this impression and thus create a seizure. The agents did not behave in a threatening manner, did not display weapons or touch Smith without permission prior to the discovery of the cocaine, and did not ask him to leave the public area of the terminal or indicate in any way that he might be forced to comply with their request to speak with him.
 
 
 13
 Smith argues that he was seized because the agent took him to a restroom for a pat-down search. The agent's testimony with regard to the pat-down was that Smith himself suggested that it be conducted in the restroom rather than in the concourse. Smith also states that a seizure occurred because Agent Davis told him he was suspected of trafficking in narcotics. Although Davis did inform Smith that he was conducting a narcotics investigation and asked for Smith's cooperation, his testimony did not indicate that he at any time told Smith that he suspected Smith of trafficking in narcotics. Successive investigatory stops might collectively be so intrusive as to amount to a seizure, as Smith asserts, but none occurred here. The surveillance officers were instructed not to stop Smith or even approach him, and they did not. The district court did not err in finding that no seizure had occurred. By implication, no arrest occurred until after the cocaine was found.
 
 
 14
 Agent Davis did detain Smith's bag to allow the narcotics detection dog to sniff it. This detention was a seizure--of the bag only--within the meaning of the Fourth Amendment; a brief investigative detention of this type is permissible if the agent has a reasonable suspicion that the luggage contains narcotics. United States v. Place, 462 U.S. 696, 706 (1983). A basis for such reasonable suspicion was present here.
 
 
 15
 Smith further contends that he did not consent to the search of his bag. He argues that his statement was not a consent, that it could not be taken as a consent because it was ambiguous, and further that it could not have been a consent because it was made under duress. Neither argument has merit.
 
 
 16
 In response to a request to search his bag, Smith's statement, 'Do what you need to do,' is not ambiguous, and conveys consent. Whether a consent is voluntary is a question of fact to be resolved by the totality of all the circumstances. United States v. Mendenhall, 446 U.S. 544, 557 (1980). Here the agent and the officers had made no attempt to restrain, coerce or threaten Smith, and Smith himself attested to the voluntariness of his previous consent to the search when he signed the acknowledgement form. The facts provide no basis for a finding that Smith did not give his consent, or that it was involuntary.
 
 
 17
 For all of the foregoing reasons, the conviction is affirmed. We dispense with oral argument because the facts and legal arguments are adequately presented in the briefs and record and it would not significantly aid the decisional process.
 
 
 18
 AFFIRMED.