# CIRCUIT COURT OF LOUDOUN COUNTY

Commonwealth of Virginia

 v.

Tomika D. White

January 28, 1999

Case No. (Criminal) 11855

BY JUDGE JAMES H. CHAMBLIN

On December 14, 1998, Tomika D. White was indicted for possession of more than five pounds of marijuana with the intent to distribute and the transportation of five or more pounds of marijuana into the Commonwealth with the intent to sell or distribute. The Defendant filed a motion to suppress any and all evidence obtained as a result of a stop of the Defendant on May 23, 1998, at Washington Dulles International Airport and the subsequent search of her luggage. The motion was heard on January 12, 1999. Counsel have subsequently submitted memoranda and authorities.

For the reasons that follow, the motion to suppress is denied as to the stop of the Defendant, but it is granted as to the search of her luggage.

## I. *Findings of Fact*

From the evidence presented on January 12, 1999, I make the following findings of fact.

On May 23, 1998, Special Agent Weeks of the Drug Enforcement Agency at Washington Dulles International Airport received information from an informant in Los Angeles, California, that a black female had boarded American Airlines Flight 76 from Los Angeles International Airport to Dulles.

He was further advised that she had red hair, was in her 20s, was walking with a cane, had two new heavy pieces of locked luggage, had paid $1,140.00 in cash for a round trip, was wearing a jogging suit, had checked in at the last minute, and was traveling under the name of Brooke Simms. The information was consistent with the characteristics of a drug courier.

Weeks went to the gate to observe the passengers arriving on Flight 76. The Defendant who is a black female was in a wheel chair being pushed by a skycap. Weeks testified that she was the closest in description to the person described in the information previously received by him. She had a crutch, not a cane. She had brown hair even though Weeks testified she had reddish-purple hair. She did have on a jogging suit. The Defendant was 7½ months pregnant, but this was not contained in the information from Los Angeles. Weeks did not testify that the Defendant was pregnant. However, a bail bondsman who saw the Defendant on May 26, 1998, testified that she was visually pregnant.

Weeks observed the Defendant as a second skycap got two large pieces of luggage. As the Defendant was being pushed away from the luggage area in the wheelchair by the skycap with the other skycap close by with the luggage, Weeks approached the Defendant. Weeks testified that the only reason he approached the Defendant was because of the information he had received from the informant in Los Angeles who said that the person described met certain characteristics of a drug courier profile.

Weeks had received no information that the Defendant had been involved in any criminal activity. At no time did he ever observe the Defendant commit any criminal act or engage in any suspicious activity.

Weeks approached the Defendant and walked beside her. He introduced himself and showed her his badge and credentials. He was in plainclothes. He did not display a weapon. He never raised his voice, touched, or restrained the Defendant. He never told the Defendant that she was free to leave or that she did not have to talk to him.

Weeks asked the Defendant if he could speak to her. She said she had no problem in speaking to him. He asked her what flight she had just arrived on, and she replied Flight 76. He then asked to see her ticket, and she produced her ticket which was in the name of Brooke Simms. He then asked her for some identification. She gave him a Utah identification card in the name of Brooke Simms.

Weeks explained that he was checking for contraband on her flight. The Defendant said that she had no contraband. He then asked her if the two pieces of luggage on the skycap's cart were hers. She said they were hers. Weeks

observed locks on both pieces of luggage. He asked her if she had keys to them. She replied that she did. Both pieces of luggage were of the type which closed with zippers.

Weeks then asked to search the luggage. The Defendant replied, "yes, you can search." After the Defendant said "yes" to the request to search, two other police officers came over to help with the search. Weeks then asked for the keys to the luggage. The Defendant gave him her key ring telling him that the keys were on the ring. The Defendant believed that the keys to the luggage were on the ring.

After trying all the keys on the ring, Weeks was unsuccessful in opening either piece of luggage. He asked the Defendant if she had other keys. She replied that she did not.

Without saying anything further to the Defendant or telling her what he was going to do or asking for her permission to do so, Weeks used a pen to pop open the zipper on each piece of luggage. The Defendant never protested Weeks's opening the luggage. She never withdrew her consent to search. The Defendant testified that she felt that she had not given permission to Weeks to break open the luggage.

Weeks testified that neither piece of luggage was damaged by his actions and that the zippers still work.

Inside the first piece of luggage, Weeks found a large block of a marijuana-like substance in cellophane paper. In the other piece of luggage, he found a similar large block. He then advised the Defendant that marijuana had been found and that she was under arrest.

The Defendant remained in the wheelchair through the whole encounter with Weeks and the other officers.

## II. Conclusions of Law

### A. Encounter Between the Defendant and Special Agent Weeks

The Defendant contends that she was seized by Weeks with neither probable cause to arrest her nor with a reasonable and articulable suspicion for an investigatory detention. The Commonwealth asserts that the encounter was consensual.

The Defendant was approached by Weeks in a public place. He was not in uniform, did not display a weapon, did not touch the Defendant, did not raise his voice to the Defendant, and did not restrain the Defendant. Although Weeks never told the Defendant that she was free to leave or did not have to

talk to him, the failure to tell an accused that he or she is free not to respond does not negate the consensual nature of the response to a question from the police. *I.N.S. v. Delgado*, 104 S. Ct. 1758 (1984).

The Defendant readily answered all of Weeks's questions without hesitation. She never asked to leave or refused to answer a question. Although there was no evidence of exactly how long the encounter lasted, there were relatively few questions asked by Weeks. The encounter was not unreasonably long.

The Defendant places emphasis on the fact that she was in a wheelchair. Even though she was in a wheelchair, she was able to move through the airport and retrieve her luggage with the help of skycaps. There was no evidence the officers did anything to prevent the skycaps from moving her in the wheelchair or assisting with her luggage. When the Defendant agreed to talk to Weeks, the skycaps did nothing to interfere with her talking to him. The skycaps also did nothing to prevent the Defendant from leaving if she desired. Further, the skycaps did nothing to force the Defendant to talk to Weeks. There was no evidence that Weeks said anything to the skycaps or directed them to do or not to do anything.

A consensual encounter between a police officer and an individual has no Fourth Amendment implications until it is accompanied by such coercion or show of force by the officer that would cause the individual reasonably to believe that he or she was required to comply and was not free to leave. *Greene v. Commonwealth*, 17 Va. App. 606, 610 (1994). As long as the individual remains free to disregard the questions and walk away, there has been no intrusion upon the individual's liberty or privacy as would under the Constitution require some particularized and objective justification. *United States v. Mendenhall*, 100 S. Ct. 1870, 1877 (1980). Each encounter must be examined from the point of view of a similarly situated reasonably prudent person. *Commonwealth v. Satchell*, 15 Va. App. 127, 130 (1992).

A reasonably prudent person in the same situation as the Defendant would not have felt that she had to answer Weeks's questions and was not free to leave. Mere cooperation with the police in answering a question does not negate the consensual nature of the response. *Greene*, 17 Va. App. at 610.

I find that Weeks's approaching the Defendant and asking her questions which she readily answered was a consensual encounter with no Fourth Amendment implications.

The Defendant has cited the United States Supreme Court case of *Reid v. Georgia*, 100 S. Ct. 2752 (1980), and the Fourth Circuit case of *United States v. Gooding*, 695 F.2d 78 (4th Cir. 1982). They are both drug courier profile

cases wherein the United States Supreme Court and the Fourth Circuit Court of Appeals held that a drug courier profile, without more, does not create the reasonable and articulable suspicion needed for a brief investigative detention or *Terry* stop. *Terry v. Ohio*, 88 S. Ct. 1868 (1968).

Both *Reid* and *Gooding* are distinguishable from this case. In *Reid*, the sole issue was whether or not reasonable and articulable suspicion existed for a *Terry* stop. Whether it was a consensual encounter was not an issue in *Reid*. As Justice Powell points out in his concurring opinion, the Georgia state courts "apparently assumed that the stop for routine identification questioning constituted a seizure and addressed only the question whether the agent's actions were justified by articulable and reasonable grounds of suspicion." The Georgia state courts, which decided *Reid* before the United States Supreme Court decided *Mendenhall*, did not consider whether or not there had been a seizure. Justice Powell went on further to say that because *Reid* did not consider the initial seizure question, "that issue remains open for consideration by the state courts in light of the opinions in *Mendenhall*." This is exactly the issue presented in this case.

Likewise, in *Gooding*, the majority decided the case on the question of whether a drug courier profile was enough to create the reasonable and articulable suspicion needed before Gooding was seized. The majority framed the issue as one of the legalities of a *Terry* stop. As pointed out by Judge Widener in his dissent in *Gooding*, the majority "makes far too much of the district court's use of the word '*Terry*' in its brief opinion." He goes further and states, "If the court had said the *Mendenhall* stop, then I take it the result in this case would have been the opposite." Like *Reid*, the issue of whether it was a consensual encounter was not addressed. This case is controlled more by *Mendenhall* than *Reid* or *Gooding*.

Consensual encounters have been upheld by our Court of Appeals. *See, e.g., Weschler v. Commonwealth*, 20 Va. App. 162 (1995) (case arising at Washington National Airport very similar to this case), and *Grinton v. Commonwealth*, 14 Va. App. 846 (1992) (police officer approached accused's vehicle at a toll booth on Interstate 95 and accused agreed to talk to him).

The facts in *Reid* and *Gooding* may be similar to the facts in this case, but those two cases did not concern the nature of the police-individual encounter. Each case started with the proposition that the encounter was a *Terry* stop and proceeded to determine if reasonable and articulable suspicion existed to justify the stop.

The Defendant correctly asserts that Weeks had neither reasonable and articulable suspicion nor probable cause when he approached her. The absence

of either is immaterial in this case because the encounter between the Defendant and Weeks was consensual.

The motion to suppress as to the encounter between the Defendant and Weeks is denied.

## B. *Consent to Search*

Because Weeks had no probable cause to arrest the Defendant and he had no reasonable and articulable suspicion that she was engaged in criminal activity, there was no constitutional justification for his search of her two pieces of luggage unless she consented to the search.

A consensual search is reasonable (and, therefore, outside of the Fourth Amendment protection against unreasonable searches and seizures) if the search is within the scope of the consent given. *Grinton*, 14 Va. App. at 850. The standard for measuring the scope of an individual's consent is one of objective reasonableness. The United States Supreme Court in *Florida v. Jimeno* framed the standard in the form of this question "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" 111 S. Ct. 1801, 1803 (1991).

The Defendant asserts that her permission to search the luggage did not extend to permission to pop open the zipper on the locked pieces of luggage for which she did not have the keys. The Commonwealth argues that the Defendant's consent to search included permission to break open the locked luggage.

Based on the exchange between the Defendant and Weeks, a reasonable person would have understood that the Defendant granted consent to search the luggage by using the key which the Defendant thought she had to unlock the luggage. A reasonable person would not have understood that the Defendant either gave consent to search by opening the luggage in any fashion which Weeks chose or that the Defendant possibly consented to the popping open of the luggage by not objecting or withdrawing her consent when she saw what Weeks was doing.

This case is similar to *Bolda v. Commonwealth*, 15 Va. App. 315 (1992). In *Bolda*, a police officer asked the accused if he had any weapons or anything of that nature before he asked him if he could search his person. The accused consented, and during the search of his person, a controlled substance was found. The Court of Appeals ruled that the scope of the consent to search extended only to a search for weapons because of the method and order in which the police officer posed his questions.

The method and order of Weeks's questions to the Defendant are likewise of significance in this case. Weeks asked the following questions in the following order:

1. Weeks asked the Defendant if the two pieces of luggage were hers, and she said they were.

2. Weeks asked her if she had the keys to the luggage, and she said she did have the keys.

3. Weeks then asked to search the luggage, and the Defendant replied, "yes, you can search."

4. Weeks then asked for the keys to the luggage. The Defendant handed him a key ring telling him that the keys were on the ring.

5. After Weeks was unsuccessful in opening the locks to the luggage with the keys that the Defendant had given him, he asked her if she had other keys. She replied that she did not.

Then without saying a further word to the Defendant, Weeks popped open the two pieces of luggage.

Weeks's question to the Defendant about keys to the luggage before he asked for permission to search created in the mind of a reasonable person that he was going to search using the keys. A reasonable person would not have felt that Weeks was going to use any means whatsoever to open the luggage when he asked to search. If Weeks intended to open the luggage using whatever means necessary, then there was no need for him to have asked a question about keys to luggage before he asked for permission to search. When Weeks asked about keys before he asked for permission to search, a reasonable person would have understood that the consent to search the luggage was limited to consent to search by unlocking the luggage with the keys that the Defendant had.

A reasonable person would have felt that the Defendant had the keys to the luggage. There is nothing in the evidence to suggest that the Defendant knew or should have known that she did not have the keys. Likewise, there is no evidence that would have led Weeks to reasonably believe that the defendant did not have the keys when he initially asked for them and she gave the ring of keys to him.

When Weeks popped open the two pieces of luggage without any further words to the Defendant after she said she had no other keys, he exceeded the scope of the consent given by the Defendant. Because he exceeded the scope of the consent, it is immaterial that the luggage was not damaged when Weeks popped them open.

The Commonwealth cited two cases that concerned forced entry after a consent to search was given. However, both cases, *United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996), and *Grinton v. Commonwealth*, 14 Va. App. 846 (1992), concerned searches of automobiles. In *Bullock*, the breaking open of a secret compartment in an automobile after consent to search the vehicle was given was upheld because the officers had probable cause to believe the vehicle contained contraband, and the officers were justified in searching the vehicle under the well-established "automobile exception." In *Grinton*, a police officer who had consent to search a vehicle removed the back seat to get into the locked trunk after the suspect said he had no key to the trunk. The search was upheld by the Court of Appeals. The suspect had asserted he had nothing in the trunk, and he did not withdraw his consent to search the trunk. The issue in *Grinton* was whether the consent extended to the trunk. The method of searching the trunk was not an issue.

In this case, no automobile was involved. Weeks did not have probable cause to search the luggage. *Bullock* is, therefore, not on point. In this case, the issue is not the extent of the search, but how the search could be conducted. Therefore, *Grinton* is distinguishable.

Because the search exceeded the scope of the consent, the motion to suppress the evidence seized as a result of the search is granted.

*Order*

The Clerk shall prepare an order granting the motion to suppress to the extent and for the reasons set forth herein. All exceptions of the Defendant and the Commonwealth are noted.