## Richmond
## ALEXANDER JULIO IGLESIAS
v.
## COMMONWEALTH OF VIRGINIA
No. 0651-86-2
Decided September 6, 1988

94

COUNSEL

Michael C. Allen (Englisby, Barnes & Allen, on brief), for appellant.

H. Elizabeth Shaffer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

## ON HEARING EN BANC

COLE, J. — Appellant, Alexander Julio Iglesias, appeals his conviction of possession of cocaine with the intent to distribute in violation of Code § 18.2-248. He presents the following questions on

this appeal: (1) whether his seizure and detention and the seizure of evidence from his motor vehicle violated rights guaranteed to him under the fourth amendment of the United States Constitution and article I, section 10 of the Virginia constitution;[1] and (2) whether the evidence adduced at trial was sufficient at law to establish beyond a reasonable doubt that he knowingly and intentionally possessed cocaine with intent to distribute.[2] For the following reasons, we find no error and affirm the conviction.

## I.

On July 17, 1985, at approximately 7:30 p.m., three Virginia State Police officers assigned to the narcotics division were stationed at the Interstate 95 toll plaza located adjacent to the Colonial Heights exit ramp. Their purpose was to observe northbound traffic in an effort to identify possible drug couriers. The officer in charge was special agent Stephen A. Berry, assisted by agents Vernon Jones and John Childers.

Berry had been a special agent investigating narcotics crimes for the Virginia Department of State Police for eight years. As part of his training, he had attended a forty hour course with the State Police Academy, a two week training course with the Drug Enforcement Administration, and an additional two week analytical school. Berry had received further specific training in the illegal transportation of narcotics through "drug courier profile" lecture material developed by the Virginia Department of State Police. He had participated in over 300 felony narcotics arrests involving a variety of activities from executing search warrants to making "street buys."

Berry was wearing blue jeans, tennis shoes, and a pullover shirt. His badge was displayed on his belt; his gun was exposed, and he

---

[1] "The Virginia requirements, under our constitution and statutes implementing [it], are 'substantially the same as those contained in the Fourth Amendment.'" *Lowe v. Commonwealth*, 230 Va. 346, 348 n.1, 337 S.E.2d 273, 275 n.1 (1985) (citations omitted). We therefore will discuss only the fourth amendment issues.

[2] This court granted the defendant's petition for appeal on three issues. In his opening brief, the defendant condensed these three issues into two, and altered the language in the first issue. Such an alteration is contrary to accepted practice and is improper. Rule 5A:12(c); *Dudley v. Estate Life Ins. Co. of America*, 220 Va. 343, 348, 257 S.E.2d 871, 874 (1979).

held a walkie-talkie in his hand. He was slightly elevated because he was standing on the barrier between the exact change lanes. This allowed him to see into cars as they went through the toll. From that vantage point, he observed two vehicles approaching. At first glance, the car to his right appeared to be a rental car from Florida because it had no tags or front windshield decals and the front license plate was an advertisement. As the car approached, the driver, later determined to be appellant Iglesias, glanced briefly at Berry, looked quickly away, and then jerked his car over to the extreme left of the toll plaza, as far from Berry as he could get.

Berry testified that Iglesias "didn't pull up [to the toll box], stop, throw his money in, wait for the barrier to raise and go." Rather, Berry said, he rolled through the barrier and threw the toll in without giving the machinery a chance to process the quarter and without giving the gate sufficient time to open so that Iglesias had to slam on his brakes at the gate to avoid hitting it. Officer Jones also testified that he saw the front end of the vehicle "dive" because the gate was down, action which he described as abnormal. Both Berry and Jones shouted at the defendant to stop, but he continued north on I-95. Berry considered this activity to be a nervous reaction to his presence. He testified that, from his experience as a police officer, rarely did he see cars go through the toll plaza as Iglesias did.

As Iglesias went through the barrier, Berry was able to make further observations: the driver was a male between the ages of 20 and 35, travelling alone; a cooler was on the right front floorboard; no luggage was in the vehicle; and the rear license plate contained the letter "Z," indicating that the car was a rental vehicle from Dade County, Florida.

Their suspicions aroused, Berry, Jones and Childers followed Iglesias in separate unmarked cars. Iglesias glanced in his rear view mirror as he drove in the left lane of I-95. When Berry, in the lead vehicle, got within seventy-five yards of Iglesias, Iglesias suddenly "jerked" his vehicle over into the right lane in front of a tractor-trailer unit, causing it to slam on its brakes to avoid a collision. Given this dangerous lane change, Berry activated the emergency lights on his car and pulled Iglesias's vehicle off the road.

Upon stopping Iglesias, Berry identified himself as a police officer and obtained Iglesias's driver's license and the car's rental papers. After a brief conversation, Berry asked Iglesias if he was transporting any illegal narcotics. He responded in the negative and said, "go ahead and search the vehicle if you want to." Berry then asked him to produce the keys to the trunk, which he did. Berry asked if everything in the car belonged to him, and Iglesias acknowledged that it did. The trunk was empty.

At the same time, special agent Jones searched the passenger compartment. In the back seat, he found a silver tote bag, unzipped and open, containing a male's personal belongings and a brown package. Jones took the brown package to the rear of the car, where Iglesias and Berry were talking. Berry opened a corner of the package and saw a white, powdery substance which appeared to him to be cocaine. A field test was performed and the substance tested positive for cocaine. Iglesias was then arrested and advised of his *Miranda* rights.

Iglesias stated that, while in Florida, he had met Jose Martinez. When Martinez discovered Iglesias planned a trip to New York to see his sister, Martinez asked him to deliver a package to New York, for which he would be paid $200. According to his statement, Iglesias did not observe where in the car Martinez had put the package, nor did he know what it contained. Martinez was to call Iglesias in New York, either at his sister's house or her office, to tell him what to do with the package.

A subsequent laboratory analysis indicated the package contained 999 grams of cocaine of seventy-four percent purity. Based on his years of experience in narcotics investigations, Berry estimated that the "street" value of the cocaine was $400,000, and that, when cut and sold in gram quantities, it would yield 4,000 separate sales. He testified that such a quantity, almost 2.2 pounds, was more than would be required for individual usage.

At trial, Iglesias moved to suppress all evidence obtained incident to the stop, contending the stop was illegal because it was not based upon probable cause or reasonable and articulable suspicion. Over Iglesias's objection, his motion to suppress was denied. At the close of the Commonwealth's evidence, Iglesias moved to strike the evidence because it failed to show that he possessed or that he had intent to distribute cocaine. The motion was over-

ruled. Iglesias was convicted of possession of cocaine with the intent to distribute and sentenced to fifteen years, eight of which were suspended. He was also fined $10,000, $8,000 of which was suspended. This appeal followed.

## II.

Iglesias contends that the trial court erred in denying his motion to suppress all evidence obtained as a result of his seizure and detention because constitutional rights guaranteed him under the fourth amendment and the Virginia Constitution were violated. More specifically, he argues that, absent independent individual indicia of criminal activity, the matching of characteristics of a drug courier profile does not provide sufficient cause for an investigatory stop, and that under the facts of this case, no credible evidence exists from which a suspicion of criminal activity can reasonably be inferred.

█ It is clear that stopping a motor vehicle on a highway and detaining the driver "constitutes a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the . . . detention . . . brief." *Lowe*, 230 Va. at 349 S.E.2d at 275 (citations omitted). But the fourth amendment does not prohibit all seizures — only those that are unreasonable. As with other categories of police action subject to fourth amendment constraints, the reasonableness of a seizure depends on a balance between the public interest and the individual's right to personal security, free from arbitrary interference of law officers. *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968).

Well established fourth amendment jurisprudence has placed police-citizen confrontations into three categories. First, there are communications between police officers and citizens that are consensual and, therefore, do not implicate the fourth amendment. Second, there are brief investigatory stops which must be based on specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant a limited intrusion. Third, there are highly intrusive, full-scale arrests, which must be based on probable cause. *United States v. Poitier*, 818 F.2d 679, 682 (8th Cir. 1987), *cert. denied*, 108 S.Ct. 700 (1988); *United States v. Hanson*, 801 F.2d 757, 760-61 (5th Cir. 1986). Because Iglesias did not raise the third type of confrontation in

the trial court,[3] we are concerned in this case with only the second type of confrontation, the so-called *Terry* stop.

There is no "litmus test" for reasonable suspicion. Each instance of police conduct must be judged for reasonableness in light of the particular circumstances. *Terry*, 392 U.S. at 21. The Supreme Court acknowledged, in *United States v. Cortez*, 449 U.S. 411, 417 (1981), that courts have used "a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person." It stated that terms like "articulable reasons" and "founded suspicion" do not provide clear guidance dispositive of the numerous factual situations that arise:

> [T]he essence of all that has been written is that the totality of the circumstances — the whole picture — must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*Id.* at 417-18 (citations omitted).

In *Cortez*, Chief Justice Burger set forth the two elements which must be present before a stop is permissible:

> First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person.
>
> \* \* \* \*
>
> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

---

[3] *See infra* part IV of this opinion.

*Id.* at 418.

 Falling into this first category of objective observations are the characteristics found in a drug courier profile, "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *United States v. Mendenhall*, 446 U.S. 544, 547 n.1 (1980); *United States v. Clardy*, 819 F.2d 670, 673 (6th Cir. 1987). It is simply an open-ended laundry list of more or less suspicious circumstances, some of which may occur in a particular case. *Grant v. State*, 55 Md. App. 1, ____, 461 A.2d 524, 526 (1983). The "drug courier profile" is a "convenient descriptive term without a great deal of legal significance." *Id.*

> [T]he suppression hearing judge and the reviewing court [must] look at the actual observations testified to on a case-by-case basis and . . . decide whether those observations add up to articulable suspicion, . . . just as if the phrase "drug courier profile" had never been coined. The only legal significance to this umbrella term called "the profile" is that the expertise of the police will be legitimately taken into consideration when we assess the significance of observations that might to the untrained layman seem completely ambiguous. . . . The special significance that a given observation might have to a trained and experienced policeman could always be established on a case-by-case basis, even if the "profile" did not exit.

*Id.*

 The courts must apply objective standards in determining whether the requisite degree of suspicion exists, taking into account that "trained police officers may be 'able to perceive and articulate meaning to given conduct which would be wholly innocent to the untrained observer.'" *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir. 1982). Attention must be focused on objective reasonableness rather than on the police officer's subjective intent. As the Supreme Court explained in *Terry*:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the law can be subjected to the more detached, neutral scrutiny of a judge who must evalu-

ate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

*Terry*, 392 U.S. at 21-22. "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time' and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)).

In the case at bar, we must examine the whole picture — the totality of the circumstances — to determine whether special agent Berry had specific articulable facts that reasonably warranted a suspicion that Iglesias was, or was about to be, engaged in criminal activity. As stated previously, the matching of an individual and his conduct to the so-called "drug courier profile" may constitute articulable facts upon which a police officer may legitimately rely. From his observation post, Berry observed Iglesias's vehicle headed northbound bearing a Florida license plate containing the letter "Z." This indicated to Berry that this was a Florida rental vehicle from Dade County, which is approximately 1,000 miles from Virginia. Iglesias appeared to be between the ages of twenty and thirty-five, within the age group that Berry's experience and training indicated might be drug couriers. In the vehicle was a cooler. From this fact Berry could infer that Iglesias wanted to avoid stops along the highway. Barry observed no luggage in the vehicle. From this fact the officer or a magistrate could infer that Iglesias was making a quick trip. These characteristics, particularly in combination, should alert a trained officer that transportation of illegal contraband may be occurring and he should be vigilant of the suspect's activities. Additionally, Berry explained that in making the stop he considered what he described as unusual behavior of Iglesias at the toll gate and thereafter. Berry testified that his first impression from this behavior was: "this man doesn't want to get close to me." Furthermore, as Berry followed Iglesias on the highway, Iglesias glanced at him in his rear

view mirror and when Berry got within seventy-five yards of him, Iglesias suddenly "jerked" his vehicle over into the right lane of travel so close to the front end of a tractor-trailer unit that it had to slam on its brakes to avoid a collision.[4] Berry testified that, upon a totality of all of these circumstances, he decided to stop Iglesias to investigate further. We find that these circumstances created a reasonable, articulable suspicion that Iglesias was transporting illegal drugs.

We are unaware of any United States or Virginia Supreme Court case which involves the stopping of a motor vehicle on the highways based upon a drug courier profile, but we find support for our decision today from fourth circuit airport drug courier cases which have held that the drug courier profile plus other unusual circumstances can create the particularized suspicion necessary to justify a stop. For example, in *United States v. Harrison*, 667 F.2d 1158 (4th Cir. 1982), Harrison matched certain characteristics of the drug courier profile: he had arrived from a known "source city;" he was among the last passengers to deplane; he carried no luggage; he appeared nervous and fidgety; and he walked very quickly. In addition, he raised the DEA agent's suspicion by making a peculiar head movement when he saw the agent looking at him, climbing a stairwell two steps at a time, and having a four to six inch bulge on his back beneath his jacket. *Id.* at 1159-60. The court, in upholding the stop, held: "While any one of these facts alone would not be sufficient to warrant a reasonable suspicion, we find that the combination of factors gave the agents reasonable suspicion to justify the initial stop for routine questioning. *Id.* at 1161. Similarly, in *United States v. Alpert*, 816 F.2d 958 (4th Cir. 1987), the court found that "the unusual conduct and dilated pupils of [the defendant] and his companion supplemented the drug courier characteristics observed . . . and provided sufficient justification to stop [him] and investigate further." *Id.* at 961 (footnote omitted).

---

[4] Officer Berry testified that Iglesias was guilty of traffic violations, but he dismissed them in order to pursue the higher drug offense.

Code § 46.1-189 provides that "[Any] person who drives a vehicle upon a highway recklessly so as to endanger life, limb or property of any person shall be guilty of reckless driving." Under Virginia law, violation of this code section is punishable as a Class 4 misdemeanor. Code §§ 18.2-8; 18.2-11; Code § 46.1-1(40).

Iglesias relies on a number of federal cases in support of his position. However, the facts of those cases are all distinguishable from the facts of the present case. In *Reid v. Georgia*, 448 U.S. 438, 441 (1980), an airport detention case, a DEA agent suspected Reid of wrongdoing because he fit certain drug courier profile characteristics: he had arrived from Fort Lauderdale, a principal place of origin of cocaine sold elsewhere in the country; he arrived in the early morning when law enforcement activity is diminished; he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together; and they had no luggage other than shoulder bags. The Supreme Court held as a matter of law that the agent could not have reasonably suspected Reid of criminal activity on the basis of the observed circumstances. *Id.* at 441. The only specific evidence was the defendant's effort to conceal the fact that he was traveling with another person. *Id. Reid* does not preclude, however, all reliance on drug courier profile evidence. It simply indicates that such generalized characteristics cannot support a *Terry* stop without more particularized evidence of wrongdoing. In the present case, Iglesias's unusual conduct at the toll booth and thereafter supplied the particularized evidence which distinguishes this case from *Reid*.

In *Gooding*, 695 F.2d at 82-83, another airport detention case, DEA agents relied upon six factors to demonstrate a reasonable and articulable suspicion of criminal wrongdoing: "Gooding arrived from New York, a source city for drugs; he was dressed casually on a 3:00 p.m. businessmen's flight; he made a telephone call immediately after arriving and subsequently made two other calls; he scanned the concourse after deplaning; he acknowledged the agents' presence in an alleged cat-and-mouse game of mutual surveillance; and two agents said his demeanor appeared distraught and nervous. In a two to one decision, the court held that the first four factors were general characteristics that "presumably innocent persons" would possess and that the last two circumstances were not enough, combined with the first four, to establish "reasonable suspicion of individualized criminal activity." *Id.* at 83. While the court noted that a "cat and mouse" pattern of mutual surveillance could supply reasonable suspicion, it found that the facts of that case did not establish such a pattern. *Id.* The court further found that, although "nervous or anxious demeanor" may be relevant to a "reasonable suspicion" inquiry, the facts of

that case did not sufficiently establish such a demeanor. *Id.* at 83-84. In this case, Iglesias's anxious demeanor was much more pronounced than Gooding's: he drove recklessly through the toll gate upon seeing Berry; he continued to glance at Berry in his rear view mirror; and he pulled dangerously in front of a tractor-trailer.

Iglesias further argues that *United States v. Smith*, 799 F.2d 704 (11th Cir. 1986), should control this case because the facts are identical. We disagree. In *Smith*, the DEA agent stopped Smith because he matched certain characteristics of a drug courier profile: Smith's car was travelling fifty miles per hour at 3:00 a.m.; the car was occupied by two individuals approximately thirty years of age; the car displayed out of state tags; the operator was driving over-cautiously; and when the operator drove past the officer who was stationed on the median strip, he failed to look in the direction of the officer's patrol car. *Id.* at 706. Based upon these factors, the officer stopped the vehicle, believing that the profile provided adequate grounds for the stop. The court found that these factors did not provide reasonable suspicion of criminal wrongdoing. The only particularized reason given for stopping the car, stated the court, was the driver's failure to look at the patrol car. *Id.* at 707. The Court held that "[s]uch an action is fully consistent with cautious driving: safety, after all, requires keeping one's eyes on the road." *Id.* The objective circumstances of erratic driving by Iglesias were not present in Smith's case. Furthermore, at the time the stop occurred in *Smith*, the opinion states only that the vehicle stopped carried out-of-state tags. The officer did not know what distance it had travelled. Nor did he know it was a rental vehicle until after the stop was made. This is clearly distinguishable from the present case, where the officers observed a Florida rental vehicle 1,000 miles from home.

Finally, in *Taylor v. Commonwealth*, 6 Va. App. 384, 369 S.E.2d 423 (1988) (en banc), a majority of this court reversed convictions of conspiracy to distribute and possession with intent to distribute, finding that the stop of the defendants' automobile violated the fourth amendment. In *Taylor*, a Chesterfield County police officer observed defendant Taylor driving a Florida rental car on northbound Interstate 95. He and the other occupant, defendant Malcolm, were black men appearing to the officer to be between twenty and thirty-five years old. His suspicion aroused,

the police officer followed the car in his unmarked car for four to five miles. Although the speed of defendants' car varied, it remained within the speed limit. When the officer pulled parallel to the driver's side of the car, the driver "cut his eyes" toward the officer and decreased his speed. Then, the officer pulled parallel to the passenger side of the car at which time both occupants "cut their eyes" at the officer. At this point, their car was stopped. The officer asked to search the car; the occupants consented, and 173 pounds of marijuana were discovered. *Id.* at 386-87, 369 S.E.2d at 424.

In reversing the conviction, a majority of this court held that

"particularized suspicion" [as required by *Terry*] is not achieved by the mere presence of drug courier profile characteristics. More is required to elevate a law enforcement officer's "inchoate and unparticularized suspicion or 'hunch'" to a "reasonable and articulable suspicion that the person seized is engaged in criminal activity."

[T]he drug courier profile [is] no more than an "inchoate and unparticularized suspicion or 'hunch.'" This "hunch" may be a useful tool for law enforcement officers in identifying those who should be closely watched, but, *without more*, cannot be justification for an investigative detention.

*Id.* at 388-89, 369 S.E.2d at 425 (citations omitted) (emphasis added). Thus, the court in *Taylor* did not rule out the use of "the drug courier profile" in contributing to "particularized suspicion," but simply ruled that the profile alone could not create "particularized suspicion."

The only circumstance in *Taylor* besides the drug courier profile was the occupants' "cutting their eyes" toward the officer's car which the court found "add[ed] nothing to the supposition that the defendants were engaged in criminal activity" because "[t]he presence of an unidentified motor vehicle alternately tracking the defendants' vehicle from one side to the other for a period of four to five miles on an interstate highway could explain why the defendants, concerned for their own safety, looked in the officer's direction." *Id.* at 389, 369 S.E.2d at 425. Thus, held the court, "[n]either the drug courier profile nor the officer's other observations provided an objective manifestation that the defendants

were, or were about to be, engaged in criminal activity," *id.*, and the evidence seized pursuant to the illegal stop should have been suppressed.

In contrast to the facts of *Taylor*, the defendant in this case, in addition to meeting several of the characteristics of "the drug courier profile," exhibited behavior more drastic than "cutting [his] eyes." At the toll barrier, Iglesias took steps to avoid the observation by the officer and later he abruptly pulled in front of a tractor-trailer in an apparent attempt to escape the police officer's view. While "the mere observation that a traveler is nervous is not indicative of criminal behavior," *id.*, the operation of a motor vehicle in such a reckless and dangerous manner to avoid the scrutiny and presence of the police, as in this case, combined with the matching of characteristics of the "drug courier profile" is sufficient to establish a reasonable suspicion of criminal activity. We find that these specific and articulable facts, when taken together with rational inferences, reasonably warranted the officer in believing that the driver was engaged in criminal activity. Therefore, Berry was justified in stopping Iglesias's vehicle in order to inquire about his identity and to obtain an explanation of the suspicious circumstances. Because the officer's initial contact with Iglesias was constitutionally permissible, we find that the trial court did not err in denying his motion to suppress.

### III.

Assuming arguendo that the initial stop was permissible, the defendant maintains that the encounter immediately escalated into a full scale seizure requiring probable cause to search. Lacking probable cause for the search, he argues, the trial court should have suppressed all of the evidence against him. We disagree.

All searches without a valid warrant are unreasonable unless shown to be within one of the well-delineated exceptions to the rule that a search must rest upon a valid warrant. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). One such exception is consent and the fact of custody alone is not enough in itself to demonstrate a coerced consent to search. *United States v. Watson*, 423 U.S. 411, 424 (1976). "[The] burden is on the Commonwealth to prove the voluntariness of any consent. And whether the consent was actually freely given is a question of fact to be

determined from 'the totality of all the circumstances.' " *Lowe v. Commonwealth*, 218 Va. 670, 678, 239 S.E.2d 112, 117 (1977), *cert. denied*, 435 U.S. 930 (1978).

After Iglesias was stopped, he exited his car and walked back toward Berry. Berry identified himself as a police officer and told Iglesias he had been stopped because he matched the characteristics of a drug courier profile. Upon request, Iglesias gave Berry his driver's license and his rental agreement for the vehicle. The car had been rented in Iglesias's own name and was to be returned to LaGuardia airport in New York City. Iglesias was then asked whether he was transporting illegal narcotics in his vehicle. He replied, "No, go ahead and search the vehicle if you want to," and he gave Berry the keys to the trunk. Next, Berry asked, "Does everything in the vehicle belong to you?" Iglesias answered, "Yes, sir." Berry then searched the trunk and special agent Jones searched the passenger compartment of the vehicle.

The uncontradicted evidence in this case establishes that Iglesias voluntarily and intelligently consented to a search of the vehicle. All of the factors that usually bear upon consent weigh in favor of the Commonwealth. The search was not made upon any claim of authority by the police; there was no show of force or coercion and they made no threats; the defendant has claimed no mental or emotional infirmity; and the police did not misrepresent their identity or purpose. *See Watson*, 423 U.S. at 424-25. In fact, Iglesias first suggested that the police officers search the vehicle, and he has not denied the voluntariness of the consent. Because a valid consent to search obviates the need to secure a warrant, the Commonwealth was not required to prove probable cause.

## IV.

Iglesias claims that, even if the initial stop was proper, it immediately escalated into a full scale seizure for which probable cause to arrest rather than reasonable suspicion to stop was required, and that under the facts of this case, probable cause to arrest was not shown. He claims that he was detained by three law enforcement officers in separate vehicles, each displaying a weapon, and that this show of force and other coercive surroundings constituted an arrest. Because there was no probable cause for an arrest, argues Iglesias, his constitutional rights were violated and the evi-

dence should have been suppressed.

We have reviewed the record in this case, including the brief filed with the trial court, and find no indication that this argument was presented in the trial court. Iglesias made it clear that the basis of his suppression motion was that the evidence was insufficient to constitute a reasonable suspicion upon which to stop the defendant's vehicle. The scope of the detention was not presented to the trial court as an issue. Accordingly, we will not consider it for the first time on appeal. *See* Rule 5A:18; *Mounce v. Commonwealth*, 4 Va. App. 433, 434-35, 357 S.E.2d 742, 744 (1987).

## V.

Finally, Iglesias maintains that the Commonwealth failed to prove beyond a reasonable doubt that (1) he knowingly and intentionally possessed cocaine or that (2) he had an intent to distribute it. He argues that the record is completely void of any direct evidence that he knew that the brown package in his vehicle contained cocaine or that he intended to distribute it.

■ We examine the evidence in accordance with the standard set forth in *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975):

Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom. We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.

■ "The Commonwealth must prove that the defendant was aware of the presence and character of the drugs and that he intentionally and consciously possessed them" to convict him of possession of illegal drugs. *Andrews v. Commonwealth*, 216 Va. 179, 182, 217 S.E.2d 812, 814 (1975). Possession may be actual or constructive. *Peterson v. Commonwealth*, 5 Va. App. 389, 402, 363 S.E.2d 440, 448 (1987). Constructive possession exists when "an accused has dominion or control over drugs." *Andrews*, 216 Va. at 182, 217 S.E.2d at 814. Such "possession may be proved

by 'evidence of acts, declarations or conduct of the accused from which the inference may be fairly drawn that he knew of the existence of narcotics at the place where they were found.' " *Id.* (citations omitted).

Iglesias was the sole occupant of a motor vehicle which he had rented in his own name and driven from Dade County, Florida, to Colonial Heights, Virginia. He also possessed keys to the motor vehicle and its trunk. After having been stopped by Officer Berry, but before the car was searched, Iglesias stated that everything in the car belonged to him. When confronted with the brown package containing the cocaine, Iglesias stated that he did not know what it was and that he had never seen it before. Finally, he admitted that he was paid $200 to deliver the package to an undetermined person in New York. The package was found in an open tote bag in the back seat which also contained clothing, a toothbrush, and a razor.

The trial court was justified in disbelieving Iglesias when he stated that he did not know of the presence of the cocaine. It was entitled to weigh the contradictory statements made by him, *Toler v. Commonwealth*, 188 Va. 774, 781, 51 S.E.2d 210, 313 (1949), and to infer that he was attempting to conceal his guilt by making inconsistent explanations. *Black v. Commonwealth*, 222 Va. 838, 842, 284 S.E.2d 608, 610 (1981). Under the facts established by the Commonwealth, the trial court was justified in finding that the defendant was in exclusive possession and control of the cocaine. Therefore, we turn to the issue of intent to distribute.

When the proof of intent to distribute narcotics rests upon circumstantial evidence, the quantity which the defendant possesses may indicate the purpose for which it is possessed. *Monroe v. Commonwealth*, 4 Va. App. 154, 156, 355 S.E.2d 336, 337 (1987). Possession of a quantity greater than that ordinarily possessed for one's personal use may be sufficient to establish an intent to distribute it. *Hunter v. Commonwealth*, 213 Va. 569, 570, 193 S.E.2d 779, 780 (1973).

The evidence established that Iglesias was in the exclusive possession and control of 999 grams of cocaine having a street value of $400,000; when cut and sold in gram quantities, it would yield 4,000 separate sales. According to the testimony of an experienced narcotics police officer, this was more than would be required for

individual usage. In addition, Iglesias was transporting the cocaine from Dade County, Florida, to New York on I-95, a recognized route of drug carriers, and a circumstance which the trial court can consider in determining the existence of an intent to distribute. Under these circumstances, we hold that the record contains ample evidence to support the conviction of the defendant for possession of cocaine with intent to distribute.

For the foregoing reasons, we affirm the decision of the trial court.

*Affirmed.*

Koontz, C.J., Coleman, J., Duff, J., Hodges, J., and Moon, J., concurred.

Keenan, J., concurring,

In my opinion, since there was no evidence before the trial court establishing the legal significance of the "drug courier profile," the match between Iglesias' individual circumstances and the profile characteristics did not provide an articulable basis for stopping Iglesias' vehicle. That the officer attached a special meaning to these profile characteristics is not sufficient. Rather, the prosecution was required to prove the *basis* for attaching such a meaning to the observed facts, as well as the reasonableness of the conclusions drawn. *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir. 1982). The Commonwealth failed to do this. I would affirm Iglesias' conviction, however, finding that a legitimate traffic infraction had occurred and that the stop was not rendered pretextual simply because Berry's subjective intent in stopping the vehicle was to investigate for narcotics.

In *United States v. Smith*, 799 F.2d 704 (11th Cir. 1982), the court articulated the following test for determining whether an investigative stop is pretextual: In determining whether an investigative stop is invalid as pretextual, the proper inquiry is whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation. *Id.* at 708 (emphasis in original). At the supresion hearing in this case, defense counsel stipulated that, based on Iglesias' driving conduct, Berry could have issued him a traffic summons. Berry also testified that a summons could have been issued for an improper lane change.

In *Smith*, the court found that the stop involved was pretextual. There, however, the only evidence of aberrant driving behavior was that the defendent once deviated six inches out of his lane and was "weaving" slightly within his lane. In contrast, in the case before us, Trooper Berry testified that Iglesias changed lanes so abruptly that the tractor trailer behind him had to "slam" on its brakes. Upon this evidence, I conclude that the stop was objectively reasonable even in the absence of a subjective intent to cite Iglesias for a traffice infraction. *See United States v. Klinger*, 409 F.2d 299, 304 (8th Cir. 1969). Therefore, since the stop of Iglesias was objectively reasonable, notwithstanding Berry's subjective intent to investigate for narcotics, I would uphold it. *Smith*, 799 F.2d at 708.

Iglesias does not contest the voluntariness of the consent to search that he gave Trooper Berry or claim that it was limited in scope. While the scope of the search conducted here exceeded the legitimate basis for the stop, I believe that Iglesias' consent operated to validate the search of the automobile. A similar factual situation was presented to the Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1972). In that case, the police had stopped an automobile for minor equipment violations: a burned-out headlight and license plate light. After the driver could not produce a license and only one of the other occupants produced identification, the officer asked if he could search the car. Upon being told, "Sure, go ahead," the officer found some stolen checks under the left rear seat of the car.

In reaching its conclusion that the consent in question was voluntary, the Court reiterated the principle that a search authorized by consent is valid and meets fourth amendment requirements. *Id.* at 222 (citing *Katz v. U.S.*, 389 U.S. 347, 358 n.22 (1967)). The Court further noted that, as such, consent searches are a legitimate method of effective police work. *Id.* at 229.

Following the reasoning employed in *Schneckloth,* I believe that Trooper Berry was entitled to proceed with the search in question since he validly stopped Iglesias and received his voluntary consent to serach the vheicle. Based on the foregoing, I would conclude that the cocaine in question was lawfully seized. Further, I agree with the majority's finding that the evidence was sufficient to establish beyond a reasonable doubt that Iglesias knowingly and intentionally possessed cocaine with the intent to distribute.

Baker, J., dissenting

Because the evidence contained in this record was not sufficient to justify Trooper Berry's belief that appellant was engaged in the transportation of illegal drugs, I respectfully dissent and would suppress the evidence discovered as a result of appellant's unlawful seizure. The majority concludes that since appellant matched certain characteristics of a "drug courier profile" and since he drove "recklessly," the seizure and subsequent search were lawful. In my opinion that conclusion is not supported by the evidence and is contrary to the prohibitions of the Fourth Amendment.[1]

## I.

Some courts have noted that law enforcement officers have employed several types of drug courier profiles.[2] A review of some of these cases and the principles derived therefrom is appropriate here. The "purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *Mendenhall*, 446 U.S. at 553-54 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 544 (1976)).

The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person," and the Fourth Amendment requires that the seizure be "reasonable." As with other categories of police action subject to Fourth Amendment constraints, *the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.*

---

[1] Had the stop of appellant been lawful, I would affirm the conviction since the discovered evidence was sufficient to support the finding that appellant was guilty as charged in the indictment.

[2] *See, e.g., Florida v. Royer*, 460 U.S. 491, 493 (1983); *United States v. Mendenhall*, 446 U.S. 544, 547 (1980); *United States v. Berry*, 670 F.2d 583, 600 (5th Cir. 1982); *State v. Cohen*, 103 N.M. 558, ___, 711 P.2d 3, 4 (1985), *cert. denied*, 106 S. Ct. 2276 (1986); *Grant v. State*, 55 Md. App. 1, ___, 461 A.2d 524, 526 (1983).

*United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975) (emphasis added) (citations omitted). When an officer makes a brief investigatory detention the Constitution does not mandate that he possess the quantity and quality of evidence required for probable cause to arrest.

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of *a suspicious individual,* in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams,* 407 U.S. 143, 145-46 (1972) (emphasis added). To justify a seizure such as is present in the case at bar, "[t]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21 (1968). The Fourth Amendment requires that the intrusion be reasonably brief, no longer than necessary to effect the purpose of the stop.

> The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Royer,* 460 U.S. at 500. "Thus, evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation." *Terry,* 392 U.S. at 29.

In order to assess the reasonableness of the officer's conduct "it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen.'" *Id.* at 20-21 (quoting *Camera v. Municipal Court*, 387 U.S. 523, 534-35 (1967)). Justice Powell, in his concurring opinion in *Mendenhall*, wrote of our society's concern with illegal drugs:

> The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement.

446 U.S. at 561-62.

I am mindful, however, that even with the great public interest described by Justice Powell, "[t]he scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry*, 392 U.S. at 21 (footnote omitted). "[S]imple 'good faith on the part of the arresting officer is not enough.' . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Id.* at 22 (citations omitted).

In *Royer*, the record reveals that at an airport two narcotic investigating officers suspected that the defendant was a drug trafficker because of "the so-called 'drug profile,'" which was defined in a footnote to be "an abstract of characteristics found to be typical of persons transporting illegal drugs." *Royer*, 460 U.S. at 493 n.2. The prosecution argued that reasonable, articulable suspicion existed to justify a temporary detention under *Terry*. The Su-

preme Court agreed but did not justify the seizure on the basis of a mechanical application of a drug courier profile. Rather the Court considered each articulated fact before determining that adequate grounds existed for suspecting Royer of carrying drugs and for detaining him. *Royer*, 460 U.S. at 502.

In *Reid v. Georgia*, 448 U.S. 438 (1980) (*per curiam*), the Court analyzed specific facts which "appeared to the agent to fit the so called 'drug courier profile,' " and concluded that such facts could not warrant a reasonable suspicion of criminal activity. *Id.* at 440-41. While the Court noted that there could "be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot," it decided that *Reid* was not such a case. *Id.* at 441.

In *Mendenhall*, Justice Stewart's opinion lists the characteristics the DEA officers thought fit "the so-called 'drug courier profile.' " 446 U.S. at 547 n.1. Since Justice Stewart, joined by Justice Rehnquist, concluded that Mendenhall was not seized, his opinion does not address whether such characteristics constituted reasonable suspicion of criminal activity. Justice Powell, joined by two other Justices, concluded in a concurring opinion that in light of all of the circumstances, the agents possessed reasonable and articulable suspicion of criminal activity. *Id.* at 565. He did not, however, base his finding on an automatic application of a drug courier profile, writing instead that "reliance upon the 'drug courier profile' [would not] necessarily demonstrate reasonable suspicion. Each case raising a Fourth Amendment issue must be judged on its own facts." *Id.* at 565 n.6.

Thus, while noting that a drug courier profile has been developed by drug enforcement officers, the United States Supreme Court has yet to specifically approve or disapprove of its use to justify an investigatory stop. I agree with Judge Moylan that the United States Supreme Court will never approve a drug courier profile developed by drug enforcement officers to be adequate to meet the *Terry* requirements:

> *It is a convenient descriptive term without a great deal of legal significance.* Some lament the fact that the Supreme Court has not yet told us whether meeting the so-called "drug courier profile" is an adequate predicate to establish either articulable suspicion for a stop or probable cause for

an arrest or search. Of course, the Supreme Court has not told us that and they never will. Indeed, they cannot, for there is no such thing as a single drug courier profile; there are infinite drug courier profiles. The very notion is protean, not monolithic. *United States v. Mendenhall*, refers to it as "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *It is simply an open-ended laundry list of more or less suspicious circumstances, some of which may occur in a particular case.*

*Grant v. State*, 55 Md. App. 1, ___, 461 A.2d 524, 526 (1983) (emphasis added) (citations omitted); *see also Taylor v. Commonwealth*, 6 Va. App. 384, 369 S.E.2d 423 (1988) (Baker, J., concurring).

Because a drug courier profile is simply a checklist of many varying characteristics, a particular profile is itself of no legal significance in the determination of reasonable suspicion. *Berry*, 670 F.2d at 600; *Grant*, 55 Md. App. at ___, 461 A.2d at 526. Whether an individual matches none, some or all characteristics of a certain profile does not perfunctorily decide one way or the other whether reasonable suspicion exists to support an investigatory stop. *Mendenhall*, 446 U.S. at 565 n.6 (Powell, J., concurring).

Instead, the critical determination is whether the specific and articulable facts upon which the particular seizure is based warrant the intrusion. *Terry*, 392 U.S. at 21-22. Thus, a match between certain characteristics of a profile and characteristics exhibited by an individual "does not automatically establish reasonable suspicion." *Berry*, 670 F.2d at 600. A judge must "evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry*, 392 U.S. at 21. A mechanistic application of a profile fails to focus on the particular circumstances of each case. "Each case raising a Fourth Amendment issue must be judged on its own facts." *Mendenhall*, 446 U.S. at 565 n.6 (Powell, J., concurring).

Such a conclusion does not necessarily render irrelevant the characteristics listed as being part of a particular profile. The fact that an individual matches one or more characteristics of a profile may in the particular circumstances justify an investigative seizure.

If an officer can *demonstrate* why some factor, interpreted with due regard for the officer's experience and not merely in light of its presence on the profile, was, in the particular circumstances of the facts at issue, of such import as to support a reasonable suspicion that an individual was involved in drug smuggling, we do not believe that a court should downgrade the importance of that factor merely because it happens to be part of the profile. *Our holding is only that we will assign no characteristic greater or lesser weight merely because the characteristic happensto be present on, or absent from, the profile.*

*Berry*, 670 F.2d at 601 (emphasis added).

The majority initiates its discussion of the so-called drug courier profile by correctly stating that it is a descriptive term without legal significance, that the reviewing court must look at the actual observations testified to on a case by case basis and decide whether they add up to reasonable suspicion, just as if the phrase "drug courier profile" had never been coined. Had the majority applied its pronouncement of law to the facts of this case, it would have been compelled to find the seizure of appellant unsupported by reasonable suspicion of criminal activity. Instead, the majority promptly ignores the view it just espoused and erroneously attaches legal significance to the concept of a drug courier profile, stating that the simple matching of an individual to a profile can be relied upon by an officer to make a stop. The opinion then proceeds to justify the stop of appellant based on his matching certain characteristics of a profile, and concludes at the end of Part II that reasonable suspicion of criminal activity was established since appellant matched characteristics of a drug courier profile. The majority thus justifies the seizure of appellant not because the facts articulated, and evaluated in light of the particular circumstances irrespective of their presence on a profile, were of such import as to support a reasonable suspicion that appellant was involved in drug trafficking, but rather simply because the facts fit a profile. A particular seizure may be constitutionally permitted because the articulated facts justify it, but not simply because those facts have been designated as a drug courier profile.

In my concurring opinion in *Taylor*, 6 Va. App. at 389, 369 S.E.2d at 425, I expressed concern that both Federal and State

courts have permitted themselves to become so engrossed with the phrase "drug courier profile" that they are being led from the reasoning of *Terry*, which gives police officers the right to make stops of persons based on reasonable suspicion. My concern increases as I read the majority opinion here to declare that a stop of an individual can be justified by the presence of a profile without evidence or explanation why the characteristics relied upon for the particular stop create a suspicion of drug trafficking. The majority in *Taylor* appears to continue the chase of the elusive profile. The chase worsens here as the majority now declares that the profile, without any explanation of the meaning of the characteristics contained on the list, is sufficient to create in an experienced officer's mind a suspicion which justifies his stopping an automobile engaged in what would otherwise appear to be innocent travel. I continue of the opinion that *Terry* governs, not a manufactured laundry list. To decide whether the record in this case supports the trial judge's finding that the actions of the police were reasonable under the Fourth Amendment, this Court must examine the articulated facts given to justify the investigatory stop of appellant's automobile to determine whether those facts warrant the intrusion. Trained police officers may be "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Brown v. Texas*, 443 U.S. 47, 52 n.2 (1979); *Brignoni-Ponce*, 422 U.S. at 884-85. The facts relied on must therefore be analyzed in light of the law enforcement officer's knowledge and expertise. *Mendenhall*, 446 U.S. at 561 (Powell, J., concurring). However, any special meaning perceived by a police officer in certain conduct because of the officer's peculiar expertise must be *articulated or demonstrated* to the court, and its reasonableness determined independently of the officer's subjective assertions, if the court rather than the officer is to be the ultimate enforcer of the Fourth Amendment. *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir. 1982); *Berry*, 670 F.2d at 601.

An examination of the record before us discloses that it is devoid of evidence as to why the facts alleged to match a "drug courier profile," and relied upon by Trooper Berry, raised a reasonable suspicion that illegal drugs were being transported by appellant.[3] Berry testified that one reason he pulled appellant's vehi-

---

[3] The majority states that Troopers Berry, Jones and Childers had their suspicions aroused by appellant and therefore followed him in separate unmarked cars. In fact, Jones

cle over was that appellant was traveling north on Interstate 95. Nothing in the record, though, indicates why northbound travel on Interstate 95 is significant or raises a suspicion of criminal activity. Such an activity is characteristic of many presumably innocent travelers. The majority's statement at the end of its opinion that Interstate 95 is a "recognized" route of drug couriers is not supported by evidence, as Berry offered no testimony on the subject of routes used by drug couriers. Without any evidence before it, the majority has, *sua sponte*, declared travel on Interstate 95 inherently suspicious.

Trooper Berry further testified that one of the facts which persuaded him to stop appellant was that appellant was driving a rental car from Florida. There is, however, no explanation in the record why the use of a Florida rental car distinguishes appellant from law abiding travelers. The majority apparently attaches significance to the approximate mileage distance between Florida and Virginia, but fails to tell us how this distance relates to the determination of reasonable suspicion to stop appellant. Berry also testified that appellant appeared to be between the ages of twenty and thirty-five and was traveling alone. We are however, left without an indication why a young male traveling alone creates a suspicion of drug trafficking. Again, the majority's statement that people in such an age group "might be drug couriers" is unsupported by any testimony. Moreover, an individual's right to personal security free from interference by law enforcement officers cannot be abridged because he "might be" engaged in criminal activity. Such a standard cannot support the seizure of a person.

Berry opined that a cooler in the car indicated that appellant did not wish to make frequent stops. Nothing is articulated in this record to show that the desire of an interstate traveler to avoid frequent stops raises a suspicion that the traveler is transporting illegal drugs. Presumably, one chooses travel upon the interstate system precisely because of a wish not to stop frequently during the journey. The record is devoid of any indication why a cooler in a car signifies the presence of drugs. As it is not unusual for travelers to carry coolers on long automobile trips in July, the Court is left to speculate why such an activity is suspicious.

testified that he followed appellant because Berry directed him to, and since Childers did not testify at all, we do not know why he followed appellant.

Berry testified that as appellant's vehicle passed through the toll booth, he observed no luggage inside the car, although in fact, luggage rested on the floor of the backseat. The majority infers that because Berry did not see luggage, appellant was making a quick trip, indicating therefore, that he was a drug courier. No evidence, however, was presented to show that a lack of luggage in the passenger compartment of an automobile signifies a quick trip, and nothing in the record indicates that those who make quick trips are drug couriers. The significance of luggage, or a lack thereof, was never articulated in the trial court. No testimony was offered that the manner in which one transports luggage bears a relationship to the trafficking of illegal drugs. The first mention that an absence of luggage in the passenger area of a car means a quick trip and the presence of drugs comes from the majority; and we are left to speculate how such a conclusion was reached since no evidence supports it. One must wonder what the majority feels is the purpose of an automobile's trunk.

Sufficiently explained, the facts introduced might support the trooper's suspicion of criminal activity and justify an investigatory stop. However, if those facts are to meet constitutional requirements, the officer must be able to articulate meaning to them so that the detached, neutral trial judge may determine the reasonableness of the officer's suspicion. *Gooding*, 695 F.2d at 82. While the facts may suggest to an experienced narcotics officer the presence of illegal drug activity which the average person could not detect, it is for the trial judge, not the officer, to decide based upon the evidence presented whether, in the light of the circumstances, the articulated facts are of such import as to support a reasonable suspicion that the person stopped was illegally engaged in transporting drugs.

In this case, there was no evidence presented to the trial judge to demonstrate that the so-called profile characteristics relied upon to seize appellant bore any relation to the trafficking of illegal drugs. It is impossible for a neutral and detached judicial officer to determine whether the trooper's suspicion was reasonable if there is nothing to indicate why the facts relied upon by the trooper were suspicious. If the trial judge merely accepts the assertion of the law enforcement officer that in his mind the facts created a reasonable suspicion, the Fourth Amendment guarantee that the reasonableness of seizures be evaluated by a neutral and

detached judicial officer is breached.

## II.

The majority attempts to bolster its position by relying on what it terms appellant's "recklessness" in driving through the toll gate and in making a lane change. Again the record fails to support the majority's view.[4] Trooper Berry testified that he noticed appellant's car "jerk to the left and he appeared to try to make a rolling stop through the toll barrier there, and the gate itself made him come to a complete stop." Berry never testified that appellant's behavior at the toll booth constituted a traffic violation. In fact he testified that other cars attempted a "rolling type stop." Berry merely characterized appellant's actions as unusual, stating that appellant did not stop where the usual traffic stopped. Appellant deposited his money in the basket and stopped at the barrier until it rose. The record does not bear out the majority's conclusion that appellant's driving behavior at the toll booth was reckless or violated traffic laws. To Berry, appellant's behavior merely indicated nervousness in the presence of a police officer, a characteristic of Berry's drug courier profile. Mere nervousness cannot justify the stopping of appellant's car.

The majority also claims that the lane change executed by appellant as he was being pursued by Trooper Berry supports the investigatory stop. Although Berry testified that he felt that a summons for an improper lane change was warranted,[5] it is clear from the record that the lane change played no part in Berry's decision to stop appellant. No evidence was presented that appellant had violated any laws when he drove away from the toll booth, yet three unmarked police cars pursued him like a posse

---

[4] The majority misstates the facts when it says that, after glancing at Trooper Berry, appellant ". . . jerked his car to the extreme left of the toll plaza. . . ." The statement implies that appellant abruptly changed lanes prior to entering a toll booth and then entered a booth away from where Berry was stationed. In fact, appellant entered the booth where Berry stood and then jerked his vehicle to the extreme left of the single booth, and not to the extreme left of the entire toll plaza. In so doing, appellant moved his car away from Berry, who was standing on his right, and toward the exact change basket in which he then deposited his toll.

[5] The only traffic violation which Berry testified that he felt appellant may have committed was an improper lane change, not reckless driving as implied by the majority's footnote 4. Moreover, he only gave that testimony after the Assistant Commonwealth Attorney suggested to him that a lane change violation was "possible."

chasing a bandit. Upon pulling appellant's vehicle to the side of the highway, Berry did not issue any traffic summons but instead informed appellant that he was being stopped because he met the profile of a narcotics courier. Berry then asked if appellant was transporting illegal narcotics.

At the preliminary hearing the following colloquy took place between defense counsel and Berry:

QUESTION: This was purely a profile stop? It was not a stop for a traffic infraction or supposition of other activity? The sole and complete basis for your stopping him was in your view he met this profile?

ANSWER: That's correct.

At the suppression hearing, defense counsel referred Berry to this testimony and asked him:

Q: Why did you answer as you did in the lower court? Was that answer correct, were you telling the truth in that incident?

A: What I felt like you were probably asking me was, was there a traffic infraction there that caused me to stop the man or did you stop him on a profile stop.

Thus, Berry's suppression hearing testimony confirmed his preliminary hearing testimony that no traffic infraction precipitated the stop. It is obvious that Berry's decision to stop appellant was based solely on appellant's matching certain characteristics listed on the police profile, and was made when appellant drove away from the toll booth. Any other conclusion is at odds with the realities of the case and simply strains common sense. A claim that the stop was based upon the alleged improper lane change is simply a pretext for what actually happened, an afterthought obviously prompted by the prosecuting attorney's attempt to add to the lack of evidence upon which to justify the seizure of appellant.

In determining when an investigatory stop is unreasonably pretextual, whether an officer theoretically could validly have stopped the car for a possible traffic infraction is not determinative. The actual subjective intent of the officer is similarly imma-

terial. A stop for a possible traffic violation becomes a pretext for an investigatory or *Terry*-stop "not because the officer secretly hoped to find evidence of a greater offense, but because it [is] clear that an officer would have been uninterested in pursuing the lesser offense absent that hope." *United States v. Smith*, 799 F.2d 704, 710 (11th Cir. 1986). Trooper Berry was never interested in pursuing an alleged traffic violator; rather he stopped appellant solely because, in his opinion, he fit some of the characteristics listed on his drug courier profile. The attempt to justify the stop upon the alleged traffic violation "was merely a pretext to legitimate the impermissible stop."[6] *United States v. Miller*, 821 F.2d 546, 549 (11th Cir. 1987); *Smith*, 799 F.2d at 711.

When we allow investigatory stops to proceed based upon pretextual reasons we further violate the Fourth Amendment requirement that the nature and scope of a seizure be reasonably related to its justification.

> The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all. The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation. The entire deterrent purpose of the rule excluding evidence seized in violation of the Fourth Amendment rests on the assumption that "limitations upon the fruit to be gathered tend to limit the quest itself." Thus, evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation.

*Terry*, 392 U.S. at 28-29 (citations omitted). "If officers were permitted to conduct *Terry*-stops based upon what conceivably *could* give rise to reasonable suspicion of minor traffic violations, the necessary connection between a seizure's justification and its scope would necessarily unravel." *Smith*, 799 F.2d at 711.

---

[6] The Attorney General also recognized the true significance of the alleged traffic violation and in argument before this Court did not rely upon the lane change but asked us to affirm the conviction based solely on facts perceived by Trooper Berry prior to his pursuit of appellant.

### III.

I recognize the great public interest in this nation's war against illegal trafficking in narcotics. I concur in Justice Powell's observations that the public has a compelling interest in detecting the illegal profiteers who deal in drugs, and further that few problems affecting the health and welfare of our population, particularly our young, cause us greater concern. *Mendenhall*, 446 U.S. at 561-62. As important as winning that war is, in fighting it the courts must not by their decisions repeal the Bill of Rights which guarantee a continued free society.

Because the record lacks an explanation why the trooper concluded that appellant's car may have been transporting contraband, I am of the opinion that the stop of appellant's vehicle was not justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct, and further that the stop cannot be justified upon an allegation of traffic violation. Therefore, the stop was an unreasonable seizure prohibited by the Fourth Amendment to the Constitution of the United States and Article I, Section 10 of the Constitution of Virginia and violative of rights guaranteed to both the innocent and guilty. The seizure being unlawful, the consent to search is invalid and the use of evidence discovered as a result of the search is prohibited. *Royer*, 460 U.S. at 507-08; *Zimmerman*, 234 Va. at 613, 363 S.E.2d at 710. Without such evidence the record does not support appellant's conviction.

Accordingly, I would reverse the judgment of the trial judge denying the motion to suppress and the subsequent conviction, and dismiss appellant from further prosecution.

Benton, J., with whom Barrow, J., joins, dissenting.

This Court recently held in *Taylor v. Commonwealth*, 6 Va. App. 384, 369 S.E.2d 423 (1988), that reasonable, articulable suspicion that illegal narcotics are being transported cannot rest solely on the fact that a traveller matches a drug courier profile. *Id.* at 388-89, 369 S.E.2d at 425; *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980). A seizure premised solely on a belief that an individual matches a drug courier profile is therefore violative of the fourth amendment. *Taylor*, 6 Va. App. at 388-89, 369

S.E.2d at 425. Today, a different majority than that in *Taylor*, including the dissenters in *Taylor*, suggest that *Taylor* is distinguishable and not controlling as a principled basis for deciding this case. I disagree and dissent.

In order to support a legitimate seizure under the fourth amendment "suspicion must be focused on the particular individual seized." *United States v. Berry*, 670 F.2d 583, 600 (5th Cir. 1982); *see Zimmerman v. Commonwealth*, 234 Va. 609, 612, 363 S.E.2d 708, 709 (1988). Iglesias was stopped solely because he fit a drug courier profile. The profile "[neither] . . . focus[es] on the particular circumstances at issue [n]or . . . indicate[s] in every case that a specific individual who happens to match some of the profile's vague characteristics is involved in actions sufficiently suspicious as to justify a stop." *Berry*, 670 F.2d at 601. In fact, the relationship of the profile characteristics to specific acts of criminality is an empirical question whose answer cannot be gleaned from this record.

There is no evidence on this record that the police officers observed conduct that suggested in light of their own experiences, and not merely because of the existence of the profile, that Iglesias was carrying drugs. Furthermore, the officers have not articulated on this record any conduct that would provide a basis for a trier of fact to draw such a conclusion. In upholding the seizure the majority ignores the basic precept of *Taylor*.

"[P]articularized suspicion" is not achieved by the mere presence of drug courier profile characteristics. More is required to elevate a law enforcement officer's "inchoate and unparticularized suspicion or 'hunch' " to a "reasonable and articulable suspicion that the person seized is engaged in criminal activity.

The characteristics which the officer relied on in this case were insufficient to support a reasonable and articulable suspicion that the defendants in fact possessed illegal drugs. Black or Hispanic males from twenty to thirty-five years of age driving northbound on Interstate 95 in Florida registered rental cars constitute a large category of presumably innocent travelers. These characteristics have no apparent relationship to criminal activity, and there is no evidence in this record of an empirical relationship between these character-

istics and criminal behavior. Thus, the drug courier profile provided no more than an "inchoate and unparticularized suspicion or 'hunch.' " This "hunch" may be a useful tool for law enforcement officers in identifying those who should be closely watched but, without more, cannot be the justification for an investigative detention.

*Taylor*, 6 Va. App. at 388-89, 369 S.E.2d at 425 (citations omitted). In order to reach the conclusion that the majority asserts, it is necessary to assume the validity of the profile as a predictor of particularized criminal activity. Because the profile "is hazy in form, susceptible to great adaptations, and almost entirely speculative," *United States v. Sokolow*, 831 F.2d 1413, 1424 (9th Cir. 1987), any conclusion that is grounded in the profile is equally speculative.

I agree with all of the discussion and analysis of the facts of this case contained in the dissenting opinion by Judge Baker. However, to the extent the legal discussion in his dissenting opinion disavows the holding of *Taylor* and acknowledges that "[s]ufficiently explained, the facts introduced might support the trooper's suspicion of criminal activity and justify an investigative stop," I cannot give my assent.

Law enforcement officers in our State have been provided with a drug courier profile developed by some other law enforcement entity and have been instructed to survey and stop vehicles that meet the profile. *Taylor v. Commonwealth*, 6 Va. App. at 393-94, 369 S.E.2d at 428, (Cole, J. dissenting). However, in assessing whether a particularized suspicion of ongoing criminal activity supports a seizure, the focus must be upon whether actions of the particular subject "betrayed an involvement in a developing crime." *Sokolow*, 831 F.2d at 1419. In analyzing the propriety of the selective and subjective intrusion that occurred in this case, and in other cases such as *Taylor* and *Castaneda v. Commonwealth*, 6 Va. App. 476, 370 S.E.2d 109 (1988), this Court is "not obliged to accept blindly any fact the police can muster when the government fails to establish any credible connection between that fact and a suspicion of ongoing (or recently completed) criminal activity." *Sokolow*, 831 F.2d at 1418. The amorphous idea, called a "drug profile," that forms the basis upon which police authorities stop young Black and Hispanic citizens who drive Florida

rental vehicles through the State of Virginia is a composite of such facts and cannot, standing alone, furnish the basis for finding particularized suspicion.

Absent evidence that the profile, which solely contains characteristics shared by large segments of the general population, has predictive validity, reliance upon a police officer's rote statement of the premise upon which the profile was compiled as a justification for stopping a traveler is contrary to the principles of *Terry*. Not only does such testimony fail to establish particularized suspicion, but, being based upon an unproved hypothesis, it is also inherently unreliable.

> In this type of case, the traditional focus on criminal activity shifts to a focus on the personal characteristics of the individual under scrutiny. Not only is this transfer of focus impermissible, its accuracy is often uncorroborated. Here, an officer must testify that a pattern of behavior, otherwise explicable as innocent behavior, does not exist in a significant number of innocent people. The officer testifies not about his own trained observation of a criminal activity, but instead about the probability that drug couriers generally exhibit certain external characteristics. Unfortunately, the testimony seldom is constructed in that extended a fashion. Empirical documentation would be necessary for the assertion that, for example, the class of nervous, cash-paying travelers to Miami does not include significant numbers of innocent persons. The court is left to evaluate not the reasonableness of an officer's assessment of facts demonstrating an ongoing criminal enterprise, but the probabilistic evidence (compiled from cases not before the court) that indicates that "innocent" behavior is not so innocent.

> \* \* \*

> The very transmutability of the profile demonstrates that it fails to justify a Fourth Amendment seizure. When the focus is away from facts indicating ongoing criminal activity and instead upon innocent behavior in which criminals may engage, virtually anything may support "reasonable" suspicion.

*United States v. Sokolow*, 831 F.2d at 1420.

The majority concludes that the officer was justified in stopping the defendant because he "exhibited behavior more drastic than" that exhibited by the suspects in *Taylor*. As Judge Baker's dissent points out, the facts do not support the majority's conclusion. Furthermore, the majority fails to explain how, even under its interpretation of the facts, the "exhibited behavior" which the officer is alleged to have detected created a suspicion of ongoing criminal activity. The officers suspicions did not rise above the level of an "inchoate and unparticularized suspicion or 'hunch.' " *Reid*, 448 U.S. at 442.

The evidence in the record belies after-the-fact attempts to provide a lawful justification for the stop. No evidence on this record supports the assertion that Iglesias attempted at any time to evade the law enforcement authorities or that he committed a traffic infraction. Again, as Judge Baker's dissent points out, the assertion by the majority opinion that Iglesias did something evasive or suspicious at the toll booth is simply unsupported by the record.

The evidence establishes that after Iglesias drove away from the toll plaza, at least three officers ran from their observation posts at the toll plaza to their vehicles in order to pursue and stop Iglesias' vehicle. Berry, whose unmarked vehicle "runs a little better than [Agent Jones' vehicle]," was the first to reach Iglesias. Berry described what occurred as he closed the distance between his unmarked vehicle and Iglesias' vehicle:

When I got up close enough, say within about 75 yards of him, he was driving in the left lane and was passing a tractor trailer. All of a sudden, he went over into the right lane in front of the trailer. The trailer had to slam on his brakes. I myself wasn't operating a marked police car. That raised my suspicions for getting out of my way, when I'm just driving an every day car.

Berry did not testify that Iglesias attempted to evade him; moreover, when signalled to do so, Iglesias pulled onto the shoulder of the highway and stopped. Agent Jones, who also pursued Iglesias, arrived at the scene in his vehicle after Iglesias had stopped and exited his vehicle. Because Iglesias was travelling at the legal speed limit of fifty-five miles per hour, it is reasonable to infer from the timing of Jones' arrival and Jones' comments concerning the speed of Berry's vehicle in relation to his that Berry was driv-

ing at a high rate of speed as his unmarked vehicle came up behind Iglesias' vehicle. Significantly, Berry's own testimony establishes that Iglesias was simply "getting out of [the] way" of Berry's fast moving vehicle when he changed lanes.

Similarly, the record fails to support the majority's conclusion that the stop was justified because Iglesias committed a traffic infraction. Iglesias was not issued a traffic ticket. Berry testified that he neither stopped nor cited Iglesias for a traffic infraction. Significantly, the Commonwealth's attorney stated during the trial: "[A]t the time[,] all [Berry] wanted to do was make a profile stop and not issue a summons, because there was no illegal activity." The assertion that Berry had a right to issue a ticket evaporates in light of those statements and the inescapable inference that Iglesias moved his vehicle into the right lane in order to clear the lane for the vehicle that was fast approaching from his rear.[1]

"[I]n determining whether an investigative stop is invalid as pretextual, the proper inquiry is whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation." *United States v. Smith*, 799 F.2d 704, 708 (11th Cir. 1986); *see also United States v. Miller*, 821 F.2d 546, 549 (11th Cir. 1987). Berry's own testimony that Iglesias "glanc[ed] in the mirror" before "getting out of [the] way" of the unmarked, fast moving vehicle as it closed behind him provides the reasonable explanation for the lane change and negates the assertion that the

---

[1] Contrary to the assertion in the concurring opinion by Keenan, J., defense counsel did not stipulate that Iglesias' driving conduct provided a basis upon which Berry *lawfully* could have issued a traffic summons. The "stipulation" was made during the following examination of Berry:

COMMONWEALTH'S ATTORNEY: Now, taking that into consideration and taking into consideration the abrupt lane change where he endangered people's lives, in your opinion —

DEFENSE COUNSEL: Judge, that is not his testimony that he endangered any people's lives.

COMMONWEALTH'S ATTORNEY: He said that the truck had to slam on his brakes. THE COURT: That's what he said.

COMMONWEALTH'S ATTORNEY: Could you have issued him a summons for a traffic violation?

DEFENSE COUNSEL: Judge, I'll stipulate they could have issued one. He could have walked over and issued him one.

Berry quite obviously *could* have issued a ticket, because he had the *power* to do so; however, the issue to be resolved is the objective reasonableness of the stop and Berry's right to issue a ticket.

lane change provided an objectively reasonable basis for the stop. Berry's testimony negates any suggestion that he had probable cause or that there in fact existed probable cause to believe that a traffic violation had occurred. The evidence, thus, provides no basis upon which to conclude that "a reasonable officer would have made the seizure in the absence of illegitimate motivation." *Smith*, 799 F.2d at 708.

Finally, in response to the suggestion in Judge Keenan's concurring opinion that the consent to search was voluntary, it should be noted that the trial judge has made no finding on this record that Iglesias' consent was voluntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). Nor could such a finding be supported by the facts of this case. "When trying to establish that there was a voluntary consent after an illegal stop, the [Commonwealth] has a much heavier burden to carry than when the consent is given after a permissible stop." *United States v. Ballard*, 573 F.2d 913, 916 (5th Cir. 1978). In discharging its burden the Commonwealth must establish that the claimed voluntary act, the alleged consent, was "sufficiently an act of free will to purge the primary taint" of the illegal seizure. *Wong Sun v. United States*, 371 U.S. 471, 486 (1963); *United States v. Recalde*, 761 F.2d 1448, 1458 (10th Cir. 1985). The record in this case fails to establish and, indeed, could not establish that the consent was free from the taint of the illegal seizure. The temporal proximity of the illegal seizure and the "consent," the lack of intervening circumstances, and the purpose and flagrancy of the law enforcement officers all lead to the conclusion that the causal connection between the illegal seizure and the "consent" remained unbroken. *See Recalde*, 761 F.2d at 1459.

For these reasons I would reverse the conviction and dismiss the indictment.