# VIRGINIA:

*In the Court of Appeals of Virginia on*   **Tuesday**   *the* **22nd** *day of* **November, 2022**.

Arun Rashid Turay,                                                                                                  Appellant,

  against          Record No. 0868-21-3
                            Circuit Court Nos. CR20000396-00 through CR20000398-00 and
                            CR20000400-00

Commonwealth of Virginia,                                                                                  Appellee.

Upon a Petition for Rehearing

Before Judges Chaney, Callins and Senior Judge Petty

On November 1, 2022 came the appellant, by counsel, and filed a petition praying that the Court set aside the judgment rendered herein on October 18, 2022, and grant a rehearing thereof.

On consideration whereof, the petition for rehearing is granted, the opinion rendered on October 25, 2022 is withdrawn, the mandate entered on that date is vacated, and this appeal will be reconsidered by the panel of judges that originally considered the matter.

Pursuant to Rule 5A:35(a), the respondent may file an answering brief within 21 days of the date of entry of this order. An electronic version of the brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,

Teste:

A. John Vollino, Clerk

By:   *original order signed by a deputy clerk of the*
      *Court of Appeals of Virginia at the direction*
      *of the Court*

Deputy Clerk

---

[1] The guidelines for filing electronic briefs can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Chaney, Callins and Senior Judge Petty
Argued at Lexington, Virginia


ARUN RASHID TURAY

                                                MEMORANDUM OPINION* BY
v.        Record No. 0868-21-3                  JUDGE WILLIAM G. PETTY
                                                OCTOBER 18, 2022
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF WAYNESBORO
                              Paul A. Dryer, Judge

            Jessica N. Sherman-Stoltz (Sherman-Stoltz Law Group, PLLC, on
            briefs), for appellant.

            Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
            Attorney General, on brief), for appellee.


        Following conditional guilty pleas, Arun Rashid Turay appeals his convictions for armed

burglary with the intent to commit robbery, robbery, use of a firearm in commission of a felony, and

felon in possession of a firearm in violation of Code §§ 18.2-90, 18.2-58, 18.2-53.1, and 18.2-308.2.

Turay asserts that the trial court erred when it denied his motion to suppress evidence obtained

pursuant to a *Terry*[1] stop.  For the following reasons, we disagree and affirm the judgment of the

trial court.

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] *Terry v. Ohio*, 392 U.S. 1 (1968).

BACKGROUND[2]

Turay and his co-defendant Justice Ahmed Carr filed a joint motion to suppress evidence.[3] At a joint hearing on those motions, Waynesboro Police Sergeant Lemons testified that at 11:30 p.m. on February 17, 2020 he was dispatched to a home in response to a potential burglary. The homeowner had called the police when his home security video system alerted him to three intruders in his home. When Lemons arrived, he spoke with the homeowner and two residents. The homeowner reported that he was missing a firearm. The two residents who sustained injuries informed Lemons that they had been "pistol-whipped" by one of the three intruders.[4] They described their assailants as "three Black males who were all armed, and that they were wearing black." Lemons transmitted over the radio that responding officers should be on the lookout (BOLO) for "three black males wearing black."

Augusta County Sheriff's Deputy Stroop was patrolling near Waynesboro when he heard the dispatch. He stopped by the crime scene and spoke with one of the Waynesboro officers outside who informed him that there had been "people inside the house that weren't supposed to be there, a firearm was taken, and then they fled on foot." Stroop continued his patrol of the area, and he heard the BOLO description over the radio. He soon encountered two men, later identified as Turay and

---

[2] "In reviewing the denial of a motion to suppress, we consider the facts in the light most favorable to the Commonwealth, the prevailing party" below. *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017) (internal quotation marks omitted) (quoting *Malbrough v. Commonwealth*, 275 Va. 163, 168 (2008)).

[3] In a separate appeal decided this day, Turay's co-defendant raised the same issue. *Carr v. Commonwealth*, No. 1136-21-3 (Va. Ct. App. Oct. 18, 2022). Because these cases were heard and decided together in the trial court, we will refer to evidence relating to both appellants in this opinion.

[4] The firearm was later recovered in the bedroom, where a resident had taken it while waiting for officers to arrive.

Carr, walking down the road in a nearby residential neighborhood. Stroop noted that it was dark, late in the evening, and cold and that there were not a lot of other people on the street.

Meanwhile, Lemons viewed the homeowner's security video footage. While watching the video, Lemons dispatched a second, more detailed BOLO. The second BOLO described the suspects as "Black males, with black hoodies, with the black pants with the red stripes—and the third individual, who had . . . a black and white striped hoodie, . . . [and] it looked like a leopard-print pajama-type bottom." In the time between Lemons' first BOLO and his watching the video of the incident, dispatch notified him that an Augusta County sheriff's deputy, later learned to be Stroop, had detained two suspects.

At the hearing, Stroop could not recall the details of the description he had heard, but he testified that he did remember that the men "matched the description of what was given out" and that he "remember[ed] saying to [him]self, 'Hey; that matches the description that I heard over the radio.'"[5] Stroop did not recall how many descriptions he may have heard or whether any updates had been provided.

Stroop decided to stop the men until the investigating Waynesboro officers could arrive. Because a firearm reportedly was involved and he was alone, Stroop initially detained the pair at gunpoint for his safety.[6] Complying with Stroop's instructions, Turay and Carr put their hands on the hood of his car, and Stroop informed dispatch that he had detained two suspects who matched

---

[5] Stroop testified that prior to the hearing he had reviewed the dispatcher's notes of the description that was put out by Lemons and that the suspects he detained matched that description.

[6] We note that, "[d]uring *Terry* stops, the police are permitted to use methods of restraint that are reasonable under the circumstances." *Harris v. Commonwealth*, 27 Va. App. 554, 563 (1998). On appeal, Turay does not contend that the amount of restraint used by Stroop was unreasonable or that it converted the encounter from a *Terry* stop to a full, custodial arrest requiring probable cause. He only argues that the initial stop was not supported by reasonable suspicion.

the description in the BOLO. Turay and Carr were detained about thirty minutes after the robbery, and Waynesboro police arrived within two minutes of their detention.

Turay and Carr were standing in front of the hood of Stroop's car when Officer Mawyer arrived at the detention site, which he testified was six to ten blocks from the crime scene. Mawyer radioed Lemons to repeat the description of the suspects; after hearing Lemons' response, Mawyer, with the help of other officers at the scene, placed Turay and Carr in handcuffs. Footage recorded by Mawyer's body camera was admitted into evidence; it depicted Mawyer's journey from the crime scene to the detention site.

When Lemons arrived, he noticed that Carr was wearing a white t-shirt, grey sweatpants, glasses, and possessed a floral backpack. Turay was wearing black jeans and a black, red-striped jacket that was similar to the black, red-striped pants he observed one of the suspects wearing in the video. Lemons noted that Turay's jacket was made of a "jogging material," so it looked to be part of a matching set with the pants he had seen one of the suspects wearing on the video.

Waynesboro Officer Cacciapaglia obtained Carr's consent to search his person and found the victims' credit cards in his pockets. Lemons then arrested Turay and Carr. The police searched Turay's backpack incident to his arrest and found bloody clothes and shoes matching those Lemons had seen on the home surveillance video; some keys and other items the victims were missing were also recovered. Turay moved to suppress the evidence.

The trial court took the matter under advisement and issued its ruling in a March 24, 2021 letter opinion. The trial court specifically addressed "whether Augusta County Deputy Stroop had the requisite reasonable, articulable suspicion to stop and detain [Turay and Carr]." In considering the issue, the trial court made certain factual findings. It found that Mawyer already was en route to the detention site when "the second description of the suspects is relayed over the radio" so that Stroop heard only the first description—"three black males wearing black"—before detaining Turay

- 4 -

and Carr shortly before 11:35 p.m.  Turay and Carr, both Black males, were walking down the street in a residential neighborhood late on a cold evening.  Based on Mawyer's body camera video, the trial court concluded that the men had been detained "a distance less than 10 blocks and likely less than six blocks," and less than a minute's drive, from the crime scene and that no other people were around.  Turay was wearing a black, red-striped sweatshirt[7] and black pants.

The trial court correctly observed that whether the evidence would be suppressed "hinge[d] on whether or not Deputy Stroop had the requisite reasonable, articulable suspicion to stop and detain the [d]efendants given the totality of the circumstances on the night in question."  Stressing "[t]he confluence of multiple factors of proximity, time, physical description, gender, and racial description[,]" the trial court denied Turay's and Carr's motion to suppress, finding that "[g]iven the totality of these facts, it would have been a dereliction of Deputy Stroop's duties as a law enforcement officer to have ignored the [d]efendants walking down the street without making an investigatory stop."  The trial court rejected Turay's and Carr's arguments focused on the discrepancies in the number of men and the specific clothing descriptions, instead finding that the "facts gave Deputy Stroop[] an objective, reasonable suspicion that the [d]efendants may have been involved in the crime that occurred a few blocks away and a few minutes before his encounter with them."

Upon denial of his motion to suppress, Turay entered conditional guilty pleas to armed burglary with the intent to commit robbery, robbery, use of a firearm in commission of a felony, and

---

[7] The trial court's memorandum opinion characterizes the garment Turay was wearing as a sweatshirt, but the officers characterize the garment as a jacket.  For purposes of this opinion, we will refer to it as a jacket.

being a felon in possession of a firearm.[8]  The trial court accepted the pleas and convicted Turay of the charges.

On appeal, Turay contends that the trial court erred in denying his motion to suppress because his "Fourth and Fourteenth Amendment Rights were violated when law enforcement, having no reasonable articulable suspicion of criminal activity, stopped and seized him."  He argues that the investigatory stop was premised on nothing more than Stroop's hunch and was unjustified because the description of the suspects was too vague and not particularized as to him.

## ANALYSIS

### I.  Standard of Review

Turay's claim that he was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review *de novo* on appeal.  *Murphy v. Commonwealth*, 264 Va. 568, 573 (2002).  In conducting our review, however, "we defer to the trial court's findings of 'historical fact'" unless such findings are "plainly wrong or devoid of supporting evidence." *Barkley v. Commonwealth*, 39 Va. App. 682, 690 (2003) (first quoting *Davis v. Commonwealth*, 37 Va. App. 421, 429 (2002); then citing *Mier v. Commonwealth*, 12 Va. App. 827, 828 (1991)).  In doing so, we are required to "give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  *McGee v. Commonwealth*, 25 Va. App. 193, 198

---

[8] Code § 19.2-254 permits a defendant to enter a conditional guilty plea in certain circumstances.  In pertinent part, it provides that

> [w]ith the approval of the court and the consent of the Commonwealth, a defendant may enter a conditional plea of guilty in a misdemeanor or felony case in circuit court, reserving the right, on appeal from the judgment, to a review of the adverse determination of any specified pretrial motion.  If the defendant prevails on appeal, he shall be allowed to withdraw his plea.

The terms of Turay's plea allowed him to appeal the trial court's denial of his pretrial motion to suppress.

(1997) (*en banc*).  On appeal, Turay has the burden to show that, considering the evidence in the light most favorable to the Commonwealth, the trial court's denial of his suppression motion was reversible error.  *Murphy*, 264 Va. at 573.

## II.  The Fourth Amendment and police-citizen encounters

In pertinent part, the Fourth Amendment provides "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated[.]"  The Amendment's protection against unreasonable seizures potentially is implicated whenever a police officer performing his or her duties encounters a citizen.

Courts have recognized three basic categories of police-citizen encounters.

> First, there are communications between police officers and citizens that are consensual and, therefore, do not implicate the fourth amendment.  Second, there are brief investigatory stops which must be based on specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant a limited intrusion.  Third, there are highly intrusive, full-scale arrests, which must be based on probable cause.

*Iglesias v. Commonwealth*, 7 Va. App. 93, 99 (1988).  Here, there is no dispute that, from its inception, the encounter between Turay, Carr, and Stroop was non-consensual.  Similarly, given that Turay only asserts that Stroop lacked reasonable, articulable suspicion to initiate the stop, it is undisputed that, at the relevant time, Stroop's seizure of Turay did not amount to a full, custodial arrest requiring probable cause.  Accordingly, the question before us is whether the trial court erred in concluding that Stroop possessed sufficient reasonable, articulable suspicion to justify a "brief investigatory stop[.]"  *Id.*

III.  The reasonable, articulable suspicion standard[9]

As noted above, police, consistent with the Fourth Amendment, may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Bass v. Commonwealth*, 259 Va. 470, 474-75 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

> Reasonable suspicion is simply suspicion that is reasonable. It is not something more than suspicion.  And it can hardly be called proof.  To be sure, the degree of certitude required by reasonable suspicion is "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less demanding than that for probable cause.'"

*Mason v. Commonwealth*, 64 Va. App. 292, 300 (2015) (quoting *Perry v. Commonwealth*, 280 Va. 572, 581 (2010)), *aff'd*, 291 Va. 362 (2016), *see also Navarette v. California*, 572 U.S. 393 (2014).  Consequently, "the mere possibility of an innocent explanation does not necessarily exclude a reasonable suspicion that the suspect might be violating the law." *Morris v. City of Va. Beach*, 58 Va. App. 173, 183 (2011) (internal quotation marks omitted).

To have reasonable suspicion, a police officer need only have a "'minimal level of objective justification' for making . . . a stop." *Branham v. Commonwealth*, 283 Va. 273, 280 (2012) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)).  Although the reasonable suspicion must be "particularized" to the person or persons stopped, *Whitfield v. Commonwealth*, 265 Va. 358, 361 (2003), the standard is such that reasonable suspicion "need not rule out the possibility of innocent conduct," *United States v. Arvizu*, 534 U.S. 266, 277 (2002).  To be sure, "the principal function of [the] investigation is to resolve that very ambiguity. . . to 'enable the

---

[9] The Commonwealth and the trial court have cited to our unpublished opinion in *Bonilla v. Commonwealth*, No. 0424-17-4 (Va. Ct. App. Feb. 20, 2018).  While we take no issue with either the reasoning or the conclusion expressed in *Bonilla*, we do not rely on it in reaching a decision in this appeal.  *See Kilpatrick v. Commonwealth*, 73 Va. App. 172, 195 n.9 (2021); *Brandau v. Brandau*, 52 Va. App. 632, 639 n.2 (2008) ("Unpublished opinions, of course, have no precedential value and thus do not implicate the interpanel accord doctrine.").

police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.'" *Morris*, 58 Va. App. at 183 (quoting *Raab v. Commonwealth*, 50 Va. App. 577, 582 (2007) (*en banc*)).

In determining whether a police officer had the "minimal level of objective justification" to justify such a stop, we consider the totality of the circumstances, *Bland v. Commonwealth*, 66 Va. App. 405, 413 (2016), and "we eschew any 'divide-and-conquer analysis' that ignores the 'totality of the circumstances,'" *Shifflett v. Commonwealth*, 58 Va. App. 732, 740 (2011). In considering the circumstances of the stop, we consider a police officer's "experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Our analysis, however, is limited to the "facts available to the officer at the moment of the seizure," *Terry*, 392 U.S. at 21-22, and does not take into account information learned after the person has been detained.[10]

"Circumstances we have recognized as relevant . . . include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *Walker v. Commonwealth*, 42 Va. App. 782, 791 (2004) (alteration in original) (quoting *Christian v. Commonwealth*, 33 Va. App. 704, 714 (2000) (*en banc*)). "The character of the location and the time at which a person is observed are relevant factors, but they do not supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped." *McCain v. Commonwealth*, 275

---

[10] Critically, this excludes certain pieces of information from our review. The trial court found that Stroop only had heard the first BOLO at the time of the seizure, and therefore, did not know any of the information transmitted during the subsequent BOLO. Accordingly, any information he learned after the detention is irrelevant to our inquiry.

Va. 546, 552 (2008). Nonetheless, "[i]f a person matches the physical description of a criminal suspect, the police have reasonable suspicion to effect a *Terry* stop of that individual." *Brown v. Commonwealth*, 33 Va. App. 296, 307 (2000).

## IV. Application to this case

The question before us is whether the trial court erred in concluding that the facts known to Stroop when he encountered Turay were sufficient to provide Stroop with reasonable, articulable suspicion that he had been involved in criminal activity. Applying the appropriate standard of review, we conclude that the trial court did not err in so concluding.

Based on the totality of the evidence and Stroop's training and experience, the record supports the trial court's finding that Stroop possessed a reasonable, articulable suspicion of criminal activity to support the investigative stop of Turay. The evidence establishes that Stroop knew that three Black males wearing black had just committed an armed robbery and had left the crime scene on foot. Shortly after leaving the crime scene, Stroop encountered Turay and Carr walking within blocks of the crime scene. It was late on a cold night, and no one else was in the area. Stroop observed that the two men, both Black males, matched the description of the suspects that he had been provided and that Turay was wearing clothing similar to that described. As the trial court found, these circumstances were sufficient to initiate an investigatory stop: "[p]ut simply, 'police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch.'" *United States v. Mitchell*, 963 F.3d 385, 391 (4th Cir. 2020) (quoting *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)).

Turay's arguments to the contrary require no different result. Although the crime had been perpetrated by three men as opposed to just one or two, it was reasonable for Stroop to

- 10 -

conclude that a group of robbers might separate upon leaving the scene of their crime, either to help avoid detection or simply because they had differing destinations. Additionally, Stroop did not need to observe any specific suspicious conduct by Turay to stop him; Stroop's suspicion was sufficiently raised regarding Turay by his knowledge of the crime that had been committed and the description of the suspects he had been provided. Stroop also had no duty to follow-up with Lemons *prior to* detaining Turay; upon detaining him, Stroop radioed that he had stopped two suspects "matching the description" he had heard, and the responding investigating officers, including Lemons, arrived at his location within minutes.

Furthermore, Stroop could detain Turay even though Carr was not wearing any black clothing at the time. Turay and Carr appeared to be companions.[11] Both suspects were near the crime scene a short time after the offenses were committed. They matched the description of the suspects—two Black males and one of whom, Turay, was wearing a black jacket. It was reasonable for Stroop to believe that Turay and Carr were together and that a robbery suspect may discard potentially identifying clothing or attempt to change his appearance when he flees the crime scene.[12]

That it was possible that Turay was not part of the threesome that had perpetrated the crime does not dictate a different conclusion. As we previously have observed,

> [t]he Fourth Amendment does not require a policeman . . . to
> simply shrug his shoulders and allow . . . a criminal to escape. On
> the contrary, *Terry* recognizes that it may be the essence of good

---

[11] At oral argument Carr's counsel conceded that Carr and Turay were walking together.

[12] The fact that the clothing worn by Turay did not exactly match the original description communicated to Stroop is of no moment. He observed the supposedly armed suspects from his car in the dark of night; he testified on several occasions that, from his viewpoint, the two men matched the description he had received from dispatch. To the extent that he was not entirely correct, any mistake on his part was reasonable. "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v. North Carolina,* 574 U.S. 54, 60-61 (2014) (internal quotation marks omitted).

- 11 -

> police work to adopt an intermediate response. A *brief stop* of a suspicious individual *in order to determine his identity or to maintain the status quo momentarily while obtaining more information,* may be most reasonable in light of the facts known to the officer at the time.

*Christian*, 33 Va. App. at 713 (first and second alterations in original) (quoting *Adams v. Williams*, 407 U.S. 143, 145-46 (1972)). Indeed, "[i]f the policeman were first required to verify all the circumstances of the crime, the opportunity to catch the criminal might be lost." *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987). Consequently, Turay's Fourth Amendment rights were not violated when Stroop detained him based on the information he had at the time, and the trial court did not err in denying his motion to suppress.

## CONCLUSION

Because the detaining officer had reasonable, articulable suspicion to detain Turay, we conclude that the trial court did not err in denying his motion to suppress. Accordingly, we affirm the judgment of the trial court.

*Affirmed.*

Chaney, J., dissenting.

For the reasons expressed in the majority opinion in *Carr v. Commonwealth*, No. 1136-21-3 (Va. Ct. App. Oct 18, 2022), and incorporated herein, decided this day, I respectfully dissent.